(No. 33508.—

JOHN REDMOND *et al.*, Appellants, *vs.* CATHERINE STEELE, Appellee.

*Opinion filed May 20, 1955.*

AUGUST B. BLACK, and JOHN J. BLACK, both of Morris, for appellants.

DUNN & HAYES, of Morris, for appellee.

Mr. CHIEF JUSTICE BRISTOW delivered the opinion of the court:

This appeal comes from the circuit court of Grundy County where the trial court directed the jury to find the issues for the defendant, thus resulting in a decree sustaining the validity of a contested will.

Instant proceedings were predicated upon a suit to set aside an instrument purporting to be the last will and testament of Mathew Redmond, deceased. The plaintiffs in the complaint were his sole heirs-at-law, consisting of his brothers, John and Frank Redmond, and his sisters Bernetta Voss and Cecelia LeRette. The suit was brought against Catherine Steele, individually, as chief beneficiary of the purported will, and against her as executrix.

The complaint charged the defendant with undue influence in the procurement of the will, and charged that there existed a confidential relationship between Catherine Steele and Mathew Redmond at the time of the execution of the will.

At the close of plaintiffs' evidence, the court overruled defendant's motion for a directed verdict. At the close of all of the evidence, the trial court directed a verdict for Catherine Steele, individually, and in her representative capacity. Among the assets of Mathew Redmond, disposed of by the will, was real estate, which gives this court jurisdiction to consider the review of the proceeding challenging the propriety of the court's determination that the plaintiffs failed to make out a case of undue influence.

Essentially, there is very little conflict in the proof. It is imperative, however, that we detail the testimony adduced on the trial rather fully so that the legal issues presented here may be properly considered and determined.

Mathew Redmond, the author of the disputed instrument, was a bachelor 64 years of age. He died on September 3, 1953. Thirty-three days previously he executed his will disposing of an estate of approximately $30,000 in value. He left only one dollar each to his brothers and sisters, the balance being bequeathed and devised to Catherine Steele whom he appointed executrix to serve without bond.

The deceased owned his home in Morris, Illinois, where he lived alone since his mother's death in 1945. He was employed as a maintenance man at the Morris Paper Mills, and there he worked steadily until his retirement in the spring of 1953. There was no intimation that Redmond's physical or mental vigor had ever become impaired at all, even though there was some proof that during the last years he had lost some weight.

Catherine Steele, 58 years of age, was married and divorced twice. Her first marriage brought her three children. Mrs. Steele went to work and managed very successfully the problem of the care and education of those youngsters. Now they are all married and doing very well.

In 1930 Mathew Redmond became interested in Mrs. Steele. He first started calling on her at her home on Illinois Avenue in Morris, where she lived with her three children. In 1932 or 1933 Mrs. Steele, with financial assistance from Redmond, purchased another home on Armstrong Street in Morris. During the period that she lived there, the deceased supplied two cook stoves and paid for the installation of a furnace and made other substantial contributions in defraying the expenses of the household. On several occasions Mrs. Steele and Redmond were engaged to be married, and symbolizing such.

agreement Mathew twice gave Catherine an engagement ring. Although no marriage resulted, the two went together uninterruptedly and with no discord until Redmond's death.

Mrs. Steele moved to Aurora in 1946 and Redmond continued to call on her at least three times a week, notwithstanding the fact that forty miles separated the two cities, Aurora and Morris. He was on friendly terms with members of the Steele family. One daughter, Elsie Hougan in particular, was the object on many occasions of his attention and benevolence. He assisted her in obtaining an education at the college in Normal, Illinois, where she received her credentials qualifying her for a teacher's certificate. In recent years Mathew attended all family functions, dinners, picnics, etc., given by Catherine's relatives. There was constantly a mutuality of interest and affection between Mathew and Catherine's children. He was good to them and they indicated respect and fondness for him.

Unfortunately, Redmond's brothers and sisters, the contestants herein, had become estranged from him. His sister, Cecelia LeRette, who lived next door to him, had slapped her brother Mathew in anger and stopped all social communications. When her brother was lying dead alone in his home on September 3, she would not permit her husband to enter his home without the guidance of the county sheriff. Redmond complained often to his many friends that his family treated him no longer like a brother; that he had to threaten court action to secure from his sister, Bernetta Voss, $12,000 worth of securities that she kept for him in her safety box. He turned these stocks and bonds over to Mrs. Steele for safe keeping after he had obtained them from his sister.

Let us now turn our attention to the events that more immediately pertain to the execution of decedent's will. The record supplies proof that reasonably indicated that Mathew and Catherine were finally to be married in early fall of 1953. Redmond told several of his friends who

had been employed with him at the factory of his contemplated marriage. Evidently they had not heard of Mathew's prior engagements to Catherine for they all expressed complete surprise. Redmond was now retired and was placed on a pension, so he was free to move to Aurora to live. This factor seem to relieve the barrier that had delayed this marriage. He and Catherine opened up a joint bank account in the Old Second National Bank in Aurora. At the time of his death this account contained $1328, nearly all of which represented his money. Mrs. Steele had in her name a safety deposit box in a bank in Aurora which contained not only the $12,000 of stocks and bonds of Redmond but also the abstract of title to his real estate in Morris.

William Born, a younger brother of Mrs. Steele, had lived in Aurora since 1931, and was employed along with his sister at the Chicago, Aurora Tailoring Company,— he, a cutter, and she, a seamstress. He had met Mathew Redmond twenty years previously at his parents' home and had known him intimately and seen him frequently ever since. Born was separated from his wife and a divorce proceeding was pending, wherein the late George Warner was his attorney. Born's testimony relating to the will episode is as follows: "Redmond came to my home the day in question between 8:30 and 9:00 A.M. and stayed approximately two hours. While assisting me with the laundry, he asked me if I knew a good attorney, and I jokingly said, 'What do you need with a lawyer?', and he said, 'I would like to make a will, I am getting to the age that I should have a will.' Upon further inquiry I told him, 'If George Warner was alive, I could recommend you to him but George Warner has passed away.' Soon he asked me if I knew anything about John Vincent, and I said, 'I'll tell you, the business that I had at Warner's office has been transferred over to John Vincent's office', and I said, 'An attorney of the calibre of Warner, I don't

think he would trust his business to a shyster and he will be all right'. Then I took Mr. Redmond to Vincent's office, saw him walk into the right doorway, then I went, saw him later on that day when he was with my sister." It appears that Born had previously been to see John Vincent on at least two occasions about his business which had been transferred to Vincent but was unsuccessful in his efforts to see him.

John Vincent, a lawyer of 25 years experience and of unquestioned integrity, testified for the defendant as follows: Mathew Redmond came to his office alone between 11:00 and 11:30 A.M., July 30, 1953, without appointment. "I had never seen him before * * * he asked me if I would draw a will for him * * * I took the information from him and entered it on plaintiffs' exhibit 37 * * * I wrote 7/30/53, that is the date I had the conference * * * He told me of his contemplated marriage * * * He told me that he wanted to leave his brothers and sisters only one dollar each for they had not treated him like a brother, that there had been 'several nasty experiences. between them' * * * He said he wanted to leave the residue of his estate to Catherine Steele, who had been and who was an old friend of his, whom he had been keeping company with for some 23 years and whom he planned to marry * * * I advised him at that time the effect marriage would have on a will and he answered, 'Well Kate and I have been planning on getting us a home on many occasions and somethings has always happened—I had a friend die recently from a heart attack and it just made me think it could happen to me'."

Vincent further testified that attorney Warner was one of the best known lawyers in Aurora in the probate field, and that after his passing he has been completing much of Warner's business and thus had become acquainted with William Born, although he had missed seeing him until long after July 30. Vincent gave Redmond a receipt for

$7.50 dated July 30, 1953. The receipt was number 8523. The receipt immediately following, 8524, was dated July 31, 1953. Redmond left the office at 12 and returned at 2:00 P.M., and upon entering the office said, "Mr. Vincent, I want you to meet Catherine Steele, the girl I told you about. We are going to get married." Vincent testified: "As I remember it I acknowledge the introduction and I congratulated him and wished her happiness; they said the event was to take place around Labor Day. After the reading of the will, it was executed and witnessed by myself and Miss Wank who has been my secretary for 25 years."

Miss Evelyn M. Wank, in testifying for the defendant, added corroboration to Vincent's version of what happened at the time of the execution of the will. She said that she kept a desk diary and upon consulting it found that the conference between Redmond and her employer began at 11:30 A.M. on July 30, 1953.

There was evidence on behalf of the defendant that Catherine and Mathew had inspected several properties in Aurora in an effort to acquire a home. They had about decided upon one located at South Fourth Street, Aurora, owned by Mr. and Mrs. Lee Riley. The evidence further shows that in the afternoon after the will was executed, Redmond had Mrs. Steele write a letter for him to the insurance company requesting that the named beneficiary be changed from his sister Bernetta Voss to Catherine Steele.

The plaintiffs argue that there were discrepancies in the testimony of the witnesses supporting the defendant that must raise an inference of guilt. For instance, Catherine Steele testified that she took the will in question and placed it in her safety deposit box on the day it was executed. The bank official testified that his record does not show that Catherine was at the bank on that day. Also there was testimony by two friends of Redmond that he was

seen in Morris on July 30, 1953, between 11:00 and 11:30 A.M. If this were true then attorney Vincent and his secretary, Miss Wank, testifying from their records, were guilty of rank perjury. It is a sensible rationalization to say that Catherine was mistaken as to the day she placed the will in the safety box, and that Redmond's friends who thought they had seen him in Morris on July 30 were likewise mistaken. It is reasonably apparent from a close inspection of the record that there was no false testimony on any of the material facts touching the material issues in this case.

It is our opinion that a fair analysis of the evidence appearing in this record indicates (1) that there is no evidence that shows any participation by the chief beneficiary in the procurement of the will, (2) there is no evidence that even suggests that the chief beneficiary exercised any influence on the testator to make the will or to include any provision in the will, (3) that there is no evidence that the beneficiary was the dominant party and the testator the dependent party, or that the will was drawn according to the beneficiary's directions, but rather the evidence demonstrates that the will was the will of the testator uninfluenced by the beneficiary. In the motion for a directed verdict at the close of all the evidence, the single question was whether there was evidence in the record when considered as true, with all the legitimate inferences to be drawn therefrom, which tended to support plaintiffs' case on the issue of undue influence. *Merlo* v. *Public Service Company of Northern Illinois*, 381 Ill. 300, 45 N.E. 2d 665; *Hunt* v. *Vermilion County Children's Home*, 381 Ill. 29, 44 N.E. 2d 612.

The presumption of undue influence arises when such undue influence is directly connected with the execution of the instrument and is operating at the time the will is made. It must be particularly directed toward procuring the will in favor of a particular party or parties, and it must be

such as to destroy the testator's will and render the instrument obviously more the will of another or others than his own. Whenever the evidence falls short of the legal requirements of establishing undue influence, it is the duty of the trial court, on motion, to exclude from the jury all evidence on the issue of undue influence. (*Lake* v. *Seiffert,* 410 Ill. 414, 102 N.E.2d 294.) It is only where a fiduciary relationship exists between the testator and the devisee who received a substantial benefit from the will, where the testator is a dependent and the devisee a dominant party, and where the testator reposes trust and confidence in the devisee and the will is written or its preparation procured by the devisee that a presumption of undue influence arises. (*Wiik* v. *Hagen,* 410 Ill. 158; *Mitchell* v. *Van Scoyk,* 1 Ill. 2d 160, 115 N.E. 2d 226.) That the testator left his property to the one with whom he had been on affectionate, friendly terms is a presumption in favor of the will. *Lake* v. *Seiffert,* 410 Ill. 444.

The contestants vigorously argue that there was a confidential relationship between the testator and Catherine Steele. The two had gone together and discussed marriage for over a period of 23 years, and there unquestionably existed a feeling of mutual trust and confidence. They were engaged to be married, they were saving money in their joint account to purchase a home and were looking for a home to buy in Aurora. There is not the slightest suggestion in the record that Catherine was in any way the dominant party. The testator was in good health, capable of driving back and forth between Morris and Aurora continually up to the time of his death. If the bank account, the execution of the will, and the change in the insurance policy had been the product of Catherine Steele's superimposed influence, and if they displeased Redmond in any way, he had every opportunity to make a change. Even accepting the premise of the appellants, that there existed between the parties here a confidential rela-

tionship, the evidence utterly fails to show any participation by the chief beneficiary. In the case of *Blackhurst* v. *James,* 304 Ill. 586, where the court found the existence of fiduciary relationship, the court said at page 603: "It is well settled and generally understood that undue influence which will invalidate a will must be influence specially directed to procuring the will favoring particular parties, must be operative at the time of the transaction, and the will must be made as the result of such influence and not the free will of the testator."

Only recently this court had occasion in the *Seiffert case* to reiterate the legal principles that have a bearing upon the propriety of a trial court in removing from the jury's consideration the issue of undue influence, and in that case the facts were more suggestive of undue influence than the one before us. In that case the chief beneficiary was a niece of the testator's deceased wife. The testator and chief beneficiary lived together and became frequent drinking companions. The evidence discloses that the testator and appellee left their home about 10:00 o'clock in the morning on January 27, 1949, and at 3:00 o'clock in the afternoon visited the office of the testator's attorney at which time and place the disputed will was drawn and executed. The scrivener testified that both the testator and appellee were in his office at the time the will was dictated, drawn and signed; that the testator told the attorney what he wanted in the will; that he wanted his niece to be the chief beneficiary and executrix; that he did not mention any other relatives; that the testator was approximately 63 years old and was in good health, while the beneficiary was in her early forties. The court, at page 448, said: "The undue influence which will void a will must be directly connected with the execution of the instrument and operate at the time it is made. It must be specifically directed toward procuring the will in favor of a particular party or parties, and it must be such as to destroy the freedom

of the testator's will and render the instrument obviously more the offspring of the will of another or others, than his own. Whenever the evidence falls short of the legal requirements of establishing undue influence it is the duty of the trial court, upon motion, to exclude from the jury all evidence on the issue of undue influence. *Ennis* v. *Gale,* 407 Ill. 215; *Challiner* v. *Smith,* 396 Ill. 106."

In all the cases cited and relied upon by the contestants, the rule is laid down that requires the following: (1) That there must be fiduciary or confidential relationship, (2) that the devisee is the dominant and the testator is the dependent party, and (3) that the will was procured by and in favor of the fiduciary through the use of his dominant fiduciary or confidential relationship. (*Wiik* v. *Hagen,* 410 Ill. 158, 101 N.E. 2d 585; *Tidholm* v. *Tidholm,* 391 Ill. 19, 62 N.E. 2d 473; *Mitchell* v. *Van Scoyk,* 1 Ill. 2d 160, 115 N.E. 2d 226.) There is not the slightest resemblance between the factual picture in those cases and the one before us. In the *Tidholm case* the testator was 86 years old and lived with his daughter, the chief beneficiary, who took the testator to the lawyer's office. She told the lawyer her father wanted to make a will. The daughter was present the entire time in the lawyer's office when the will was prepared. When the lawyer asked the testator for the names and amounts involved, the testator asked the chief beneficiary, the daughter, Amy, to put down the information, which she did and gave it to the lawyer. When the lawyer said he could have the will ready the next day, the daughter said she would rather have it sooner, and appellee and testator appeared that afternoon and had the will executed in the presence of the chief beneficiary. The defendant's answer in that case admitted that the testator sustained a very close and confidential relationship with her, that he reposed confidence in her and entrusted his business and confidential affairs into her hands and

had become more or less dependent upon her, and that she had lived with him all her life.

In the *Mitchell case* the testator was 91 years old at the time of the execution of the purported will and was in very bad health. He was bothered with a kidney and bladder ailment and had trouble controlling his bowels. During the entire year of 1949 and until his death, he was confined to his home where he lived with the chief beneficiary. During the last two years of the testator's life and at the time the will was executed the chief beneficiary did all his business for him. She opened a bank account for him in 1948 and made all the deposits and withdrawals upon checks signed by him. The testator depended upon the chief beneficiary to care for his physical needs and to handle his legal affairs. The chief beneficiary hired a lawyer and defended a conservatorship brought against the testator although he had little interest in it. Concerning the drafting of the will, the chief beneficiary was present at all times during the discussion as to what the will should contain. The chief beneficiary, Martha Spear, participated in the discussion of what was to be in the will and secured the witnesses to the will by prearrangement to its execution, which witnesses were strangers in the community and were unknown to the testator.

Catherine Steele and her children had been good to Mathew Redmond for many years; they had invited him into their family circle at every opportunity when they gathered on festive occasions; after finishing his life's work at the factory in Morris, where he toiled diligently and developed an estate of moderate size, he was then free to move to Aurora and join Catherine in matrimony. It was most natural for him to make a will giving everything to the woman who was shortly to be his wife and to leave nothing to his relatives who had been unkind to him. As this court said in the *Seiffert case* at page 450,

"There is nothing unnatural in the fact that the testator left his property to a niece of his wife, with whom he had been on friendly terms for a long period of years." In *Harp* v. *Parr*, 168 Ill. 459, at page 471, this court said: "The presumption also is in favor of the validity of the will, when the person, who is provided for therein, is one with whom the testator had maintained intimate and affectionate relations during his life." We conclude, therefore, that the proofs in this case fail to show any dominance by the beneficiary over the mind of the testator and fail to show any act, word, or deed that would even tend to suggest that the beneficiary was active in procuring the will in question. The lower court acted properly in directing a verdict at the close of all the evidence and the decree entered thereon is affirmed.

*Decree affirmed.*