578 N.E.2d 1253 (1991)
218 Ill. App.3d 1069
161 Ill.Dec. 607
Gerhard R. MACHE and Anita Slansky, as successor co-trustees of the Gerhard M. Mache Declaration of Trust, dated October 16, 1979, as amended, and Gerhard R. Mache, as successor trustee of the Anna M. Mache Declaration of Trust dated January 14, 1989, Plaintiffs-Appellants,
v.
Anna Bogucka MACHE, Defendant-Appellee.
No. 1-91-0427.
Appellate Court of Illinois, First District, Fourth Division.
September 5, 1991.
*1254 Sharon Swarsensky Bilow & Joanne A. Sarasin of Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C., Chicago, for plaintiffs-appellants.
Thomas C. Baratta, Jr. & Assoc., Melrose Park (Thomas C. Baratta, Jr., Samuel A. Garnello, of counsel), for defendant-appellee.
Presiding Justice JIGANTI delivered the opinion of the court:
This is an interlocutory appeal from the denial of a preliminary injunction. The plaintiffs, Gerhard R. Mache and Anita Slansky, filed an action to enjoin the defendant, Anna Bogucka Mache, from transferring or converting to her own use funds allegedly obtained as a result of the defendant's undue influence over her husband, decedent Gerhard M. Mache. The plaintiffs are the decedent's children. At the close of the plaintiffs' evidence at the preliminary injunction hearing, the trial court directed a finding in favor of the defendant and against the plaintiffs and denied injunctive relief. The plaintiffs have appealed, contending that the trial court abused its discretion in denying their motion for a preliminary injunction and that the court improperly excluded expert testimony on the issue of undue influence.
At the time he met the defendant in 1982 Gerhard Mache was a 72-year-old widower. The defendant Anna Bogucka was a well-educated 58-year-old woman who had emigrated from Poland in 1964. They married in 1982. Prior to the marriage, Gerhard and Anna entered into a prenuptial agreement which provided that each would renounce all rights to the other's property upon death or divorce. They were legally separated in 1988. Under the terms of the separation agreement, Gerhard set up a trust which would provide Anna with an annual income of $7,400 for the rest of her life. Upon termination of the trust, the principal was to be paid to Gerhard's children. Although Anna and Gerhard socialized frequently and traveled together after the separation, they lived apart until June of 1990, when Gerhard was diagnosed as suffering from terminal cancer. At Gerhard's request, Anna moved in with him and took care of him. Between June of 1990 and October 5, 1990, the date Gerhard died, Gerhard made transfers of funds totaling $360,000 to Anna. These are the transfers which the plaintiffs contend were the result of Anna's undue influence over Gerhard.
At the hearing on their motion for a preliminary injunction, the plaintiffs attempted to call a psychiatrist, Dr. Bennett G. Braun, as their first witness. Following Dr. Braun's testimony concerning his qualifications, the trial court expressed doubt that his testimony would advance the relevant inquiry before the court. Further questioning established that Dr. Braun had been retained by the plaintiffs as a testifying expert 10 days before the hearing, that he reviewed the records of Gerhard's doctors and conducted telephone interviews with Gerhard's three children and three of his neighbors. At that point, the trial court granted the defendant's motion to disqualify Dr. Braun as an expert witness and allowed the plaintiffs' attorney to make an offer of proof as to his expected testimony. According to the offer of *1255 proof, Dr. Braun would have testified that he conducted a "psychiatric autopsy" of Gerhard and determined that at the time he transferred the funds in question to Anna he was in a dependent relationship with her. Dr. Braun would have testified that in his opinion Anna had overpowered Gerhard's will and induced him to make transfers of money to her that he would not have otherwise made. This opinion was based upon Gerhard's total dependence on Anna and the effect of the pain medication Gerhard was taking. Following this offer of proof, Vhokaraju S. Deva, a radiation oncologist, testified that she administered several courses of radiation treatment to Gerhard in an effort to decrease his pain. She also prescribed long-acting morphine tablets to be taken by Gerhard when was he was an outpatient. Dr. Deva testified that although Gerhard was in a lot of pain, he was alert, coherent, able to understand the doctor and "knew what he wanted."
The plaintiffs then called the defendant Anna Bogucka Mache as an adverse witness. Anna testified that she was born in Poland and was fluent in English, Polish and German. She stated that she met Gerhard Mache in 1982 and that they were married four or five months later. According to Anna, Gerhard had been born in Germany and was pleased by the fact that Anna spoke German. Prior to the marriage Anna's only asset was a $10,000 savings account. Gerhard had assets worth approximately $2 million. Although she signed a prenuptial agreement before the marriage, she did not read it until approximately six years later. At that time she initiated divorce proceedings which resulted in a separation agreement. As stated earlier, the separation agreement provided that Gerhard would set up a trust which would pay Anna $7,400 per year for the rest of her life. It further provided that Anna would have no other claims on Gerhard's assets. Anna admitted that when she discovered the prenuptial agreement, she felt she had been tricked and was angry with Gerhard. However, she testified that after the separation Gerhard seemed more relaxed and sought her company. They saw each other daily from Christmas of 1989 forward. Anna characterized their relationship as a "secret marriage." She explained that Gerhard wished to avoid conflict with his children and did not want them to know that he and Anna were together. In 1989, they took a trip to Germany but traveled separately so the children would not know that they were together. In February of 1990, Gerhard and Anna took a two-week trip to Florida and in March of 1990 he bought her a car. In April of 1990 he gave her $20,000 in exchange for her signature on a gift tax return.
Anna testified that she was with Gerhard in his car on June 24, 1990, when he turned the wheel and suffered pain in his right arm. They went to the emergency room where it was learned that Gerhard had a broken arm. Shortly after this incident, Gerhard's doctors discovered that he had incurable cancer. Gerhard asked Anna to move in with him and take care of him. Anna testified that she agreed, and that she cared for Gerhard 24 hours a day. She slept on a couch in his room, washed him, cooked for him and fed him. Anna took him to his doctor appointments, filled his prescriptions and administered his pain medication. When she became too exhausted to care for Gerhard alone, she hired a nurse. The nurse spoke Polish and had a very limited English vocabulary. Gerhard did not speak Polish. Gerhard asked Anna to stay with him despite expected difficulties from his children. She did so.
On July 17, 1990, Gerhard transferred $100,000 from his trust fund account at Merrill Lynch to the trust that had previously been set up for Anna. Also in July of 1990 Gerhard purchased a $60,000 condominium for Anna. The purchase price was paid for by two checks from Gerhard. The first check, dated August 1, 1990, was in the amount of $50,000. The check was made out to "Gerhard M. Mache" and endorsed by "Gerhard M. Mache Trustee." Anna then endorsed the check and deposited the funds into her savings account. The second check, dated August 11, 1990, was in the amount of $10,000 and was made *1256 payable to Anna Mache. Title to the condominium was held jointly by Anna Mache and a married couple who were friends of Anna's.
On August 22, 1990, Gerhard wrote a letter to his stockbroker at Merrill Lynch directing him to immediately transfer all of the assets in the Anna Mache trust to a new account in Anna's name alone. The Anna trust at that time contained assets worth $200,000. Two days later, Anna drove Gerhard to a currency exchange where Gerhard's signature on the transfer letter was notarized. Anna then delivered the letter to Merrill Lynch on that same day. Although Gerhard was with her, he waited in the car while she delivered the letter to Gerhard's stockbroker.
In early September, Anna became ill from exhaustion and required hospitalization. Gerhard was admitted to the hospital the following day because his pain could not be adequately controlled at home. On September 11, 1990, Gerhard authorized a transfer of $100,000 from his trust account to Anna's account. The document was notarized by Marilynn Arnoux, an employee of the hospital. Sometime in September, Gerhard brought his children together and told them, in Anna's presence, that he had made a transfer of funds to Anna in the amount of $100,000. Although Anna knew the actual amount was $360,000, she said nothing because she was "not allowed to." According to Anna, Gerhard was afraid of his children and told her that they were "vicious and greedy" and would "play dirty tricks" on her.
Marilynn Arnoux, the hospital secretary who notarized the September 11, 1990, transfer letter, testified that she had been called to notarize Gerhard's signature on September 10. However, Anna later called and told her to come the following day because Gerhard was expecting guests. When Gerhard notarized the transfer letter, he was alert, stated that he knew what he was signing and signed clearly and firmly.
Gerhard R. Mache, the decedent's son, testified that he was the executor of Gerhard's estate. While Gerhard was alive, he gave the witness his power of attorney, made him co-trustee of Gerhard's trust and trustee of Anna's trust. The witness testified that a few days after September 11, 1990, Gerhard signed approximately $400,000 in gift checks to members of his family in an effort to minimize estate taxes. Although the checks were dated September 11, 1990, the witness stated that he did not give them to Gerhard to sign on that day because Gerhard was sleepy and groggy and might not have fully understood what he was signing. When he asked Gerhard's stockbroker, Robert Curry, to liquidate certain bonds in Gerhard's account in order to cover the checks, he was told that there had been some "activity" in Gerhard's account and that the remaining bonds were insufficient to cover the checks. Curry would not discuss the account further, so the witness went to Gerhard's house and asked if Gerhard had intended to transfer any funds to Anna. Gerhard said that he did not and became very upset. According to the witness, Gerhard apologized for having previously accused his children of stealing funds from his account and suggested that he be declared incompetent so that no further damage could be done. When the witness suggested initiating proceedings to attach Anna's condominium, Gerhard refused and stated that he had given her only a $10,000 down payment for the condominium. The witness then immediately prepared a document removing Gerhard as co-trustee of his trust account and Gerhard signed it.
Sid Levine, Gerhard's attorney, testified that Gerhard frequently consulted him concerning estate planning and that, at one point, he suggested that Gerhard give Anna $50,000 in exchange for her signature on a gift tax return which would have resulted in $150,000 in tax savings. Gerhard said that he did not have to give her that much money and ultimately paid her $20,000 to sign the return. Levine testified that Gerhard did not consult with him prior to transferring funds to Anna.
Robert Curry, the stockbroker with Merrill Lynch, testified that he managed Gerhard's trust accounts at the time the transfers *1257 to Anna took place. In his opinion, Gerhard was a sophisticated investor. Curry testified that the trust set up for Anna was originally to pay her income only, but that in the spring of 1990, Gerhard told Curry that he wanted to take the money out of the trust and give it to Anna. According to Curry, Gerhard was very concerned that his children not know about the transfers of funds to Anna. Curry testified that "the general theme was [Gerhard] felt it was not their business. And I certainly felt it was at least implicit if not explicit in what he said that he was concerned that they might try to prevent it." Gerhard told Curry that he wanted Anna to be taken care of upon his death. Anna was not with Gerhard when he had these conversations with Curry.
At the conclusion of the plaintiffs' case, the defendant moved for a directed finding. The trial court granted the motion, finding that the plaintiffs' evidence failed to raise even an inference that Anna obtained any funds through undue influence over Gerhard. The court found that Gerhard had given gifts to Anna prior to his illness and that he turned to her for care and comfort when he learned that he was terminally ill.
On appeal, the plaintiffs contend that the trial court erred in denying their motion for a preliminary injunction.
To be entitled to injunctive relief, a plaintiff must show that it had: a protectable interest in the subject matter of the litigation; a likelihood of prevailing on the merits of the claim; that it would suffer irreparable injury in the absence of an injunction; that it had no adequate remedy at law; and that the benefits of granting the injunction would outweigh any possible injury to the defendant. (Agrimerica, Inc. v. Mathes (1988), 170 Ill.App.3d 1025, 1030-31, 120 Ill.Dec. 765, 524 N.E.2d 947.) On the issue of likelihood of success on the merits, a plaintiff need only raise a fair question of the existence of the right claimed. (Alanis v. Fairway Ford (1980), 89 Ill.App.3d 458, 460, 44 Ill.Dec. 679, 411 N.E.2d 1045.) It is well established that the grant or denial of injunctive relief is a matter that rests within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. (Blakemore v. Lake Holiday Property Owners Ass'n (1986), 144 Ill.App.3d 199, 207, 98 Ill.Dec. 259, 494 N.E.2d 186.) It is within the province of the trial court in its role as the trier of fact to determine the credibility of the witnesses and the weight to be given their testimony. (In re Marriage of Ligas (1982), 110 Ill.App.3d 1, 6, 65 Ill.Dec. 763, 441 N.E.2d 1277.) Where two or more equally plausible interpretations can be made from the facts, the judgment of the trial court will be sustained. Nemeth v. Banhalmi (1984), 125 Ill.App.3d 938, 963, 81 Ill.Dec. 175, 466 N.E.2d 977.
In the case at bar, the plaintiffs' complaint alleges that the transfers of funds to Anna resulted from her exercise of undue influence over Gerhard. Undue influence has been defined as any improper urgency of persuasion whereby the will of a person is overpowered and he is induced to do an act which he would not do if left to act freely. (Franciscan Sisters Health Care Corp. v. Dean (1983), 95 Ill.2d 452, 460, 69 Ill.Dec. 960, 448 N.E.2d 872.) Ordinarily, a presumption of undue influence arises where a fiduciary relationship is shown to exist. (In re Estate of Mooney (1983), 117 Ill.App.3d 993, 997, 73 Ill.Dec. 169, 453 N.E.2d 1158.) However, the presumption does not arise as to conveyances between a husband and wife, where, instead, a presumption of gift arises. (Miethe v. Miethe (1951), 410 Ill. 226, 231, 101 N.E.2d 571; Wold v. Wold (1976), 43 Ill. App.3d 773, 2 Ill.Dec. 460, 357 N.E.2d 627.) The presumption of gift may be rebutted under certain circumstances which tend to negate donative intent, as for example where the property conveyed consisted of the husband's entire estate. Scanlon v. Scanlon (1955), 6 Ill.2d 224, 231, 127 N.E.2d 435.
Essentially, the plaintiffs' argument in this appeal is that the trial court drew the wrong inferences from the evidence presented. The plaintiffs contend that Anna's actions in moving in with Gerhard and caring for him during his terminal illness should have been interpreted as an *1258 attempt by her to overcome his will and influence him to give her money. They further contend that because the transfers took place in what they considered a clandestine and somewhat unusual manner, the court should have inferred that Gerhard did not understand what was taking place.
A thorough review of the facts, as stated above, leads to the equally supportable inference that Gerhard cared for Anna and wanted to provide for her after his death. Although Anna and Gerhard were legally separated, the record shows that they took vacations together and saw each other on an almost daily basis. As stated earlier, conveyances between a husband and wife are presumed to be gifts. Although the plaintiffs cite Miethe v. Miethe (1951), 410 Ill. 226, 101 N.E.2d 571, and Wold v. Wold (1976), 43 Ill.App.3d 773, 2 Ill.Dec. 460, 357 N.E.2d 627, in support of their argument that the presumption of gift has been rebutted, we find these cases factually remote from the case at bar. For example, in Miethe, the challenged conveyance consisted of the husband's entire estate. In Wold, the wife to whom the property was conveyed was a successful business woman with substantial assets, while the husband was a chronic alcoholic who was isolated from his family. Here, Gerhard was described as a shrewd investor who accumulated an estate in excess of $2 million and who was described by many of the witnesses as alert and purposeful in his actions. Testimony by Anna and by Robert Curry, Gerhard's stockbroker, supports the inference that Gerhard took steps to hide the transfers from his children not because his will was overborne but rather because he knew they would disapprove and even might try to prevent Anna from receiving the funds. There is no testimony in the record to show that Anna attempted to restrict Gerhard's access to the plaintiffs, his attorney or his financial advisers. The testimony was consistent that Gerhard understood what he was doing when he effectuated the transfers to Anna and that he did so of his free will. The only evidence to the contrary was the testimony of plaintiff Gerhard R. Mache, who stated that Gerhard said that he did not intend to give money to Anna and suggested that he be declared incompetent. The trial court apparently rejected this testimony.
In our view, the trial court acted well within its authority in determining that no evidence of undue influence was presented and that the plaintiffs accordingly failed to establish even a fair question as to their right to the challenged funds.
The plaintiffs then argue that the court erred in refusing to allow testimony by an expert witness, Dr. Bennett Braun, on the issue of undue influence. The plaintiffs maintain that it was unfair for the court to preclude this testimony, then to subsequently find that the plaintiffs failed to meet their burden of showing that undue influence existed.
The modern standard of admissibility of expert testimony is whether the testimony will aid the trier of fact in its understanding of the facts presented at trial. (Johnson v. Commonwealth Edison Co. (1985), 133 Ill.App.3d 472, 482, 88 Ill.Dec. 449, 478 N.E.2d 1057.) While an expert may express an opinion on an ultimate issue, expert opinions are generally not admissible on matters of which the trier of fact is knowledgeable unless the subject is difficult of comprehension and the testimony will aid the trier of fact in understanding it. (McCormick v. McCormick (1988), 180 Ill.App.3d 184, 205, 129 Ill.Dec. 579, 536 N.E.2d 419.) The decision as to whether to admit evidence rests within the discretion of the trial court and will not be reversed absent a clear abuse of discretion. McCormick.
A review of the offer of proof contained in the record reveals that Dr. Braun merely applied the facts of the case to the relevant law and opined that Gerhard was in a dependent relationship with Anna and that she exerted undue influence over him with regard to the transfers of funds. In essence, the proposed testimony constituted nothing more than a legal opinion and did not touch upon matters beyond the understanding or comprehension of the court. The trial court is allowed wide discretion in determining the admissibility of such testimony, *1259 and we find no abuse of that discretion in the instant cause.
Accordingly, the judgment of the trial court is affirmed.
Affirmed.
LINN and McMORROW, JJ., concur.