*In re* ESTATE OF FRANK J. GLOGOVSEK, Deceased (Antonia M. Tynan, a/k/a Antonette M. Tynan, Petitioner-Appellee, v. Sharon Ann Weck, Indiv. and as Ex'r of the Instrument Purported to be the Last Will and Testament of Frank J. Glogovsek, Deceased, *et al.*, Respondent-Appellants).

Fifth District   No. 5—91—0891

Opinion filed August 5, 1993.

P.K. Johnson, Jr., of Johnson & Johnson, of Belleville, for appellants.

Kay A. Welch, of Lindauer, Vick & Welch, of Belleville, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

This case is on appeal from a ruling in a bench trial that the last will and testament of Frank J. Glogovsek, deceased, be set aside. The respondents raise the issue of whether the trial judge erred in applying a presumption of undue influence by testator's spouse towards testator, causing testator to designate his stepchildren as contingent beneficiaries, if his wife predeceased him, as opposed to decedent's sister and her children. We find that the trial judge erred, and we reverse.

Respondent Sharon A. Weck defends individually as Frank's stepdaughter and as the executrix of his will. Respondent Robert L. West is Frank's stepson. Both respondents inherited under Frank's will. Petitioner, Antonia Tynan, is Frank's sister. Her three daughters, Betty Voss, Rose Marie Quirin, and Helen Nugent, acting under a durable power of attorney executed in their behalf by petitioner, have actually handled the prosecution and appeal of this case. Respondent Walter Glogovsek is Frank's brother, and he settled before trial.

Frank executed his contested will on April 5, 1988. Margaret died just three months later in July 1988. Frank died on July 6, 1989, at the age of 88, one year after Margaret's death. His will was admitted to probate on July 13, 1989. Petitioners contested the will, alleging that Frank did not have testamentary capacity to execute the will and

that Sharon and Margaret had unduly influenced him in making the will.

The evidence presented was substantially as follows: Frank and Margaret were married in 1954. Frank did not have any children of his own, but Margaret, a widow, had two children by a former marriage, namely Sharon and Robert. Sharon was 13 at the time of the marriage and lived with Frank and Margaret until she was 20 years old. Robert was already in the service at the time of their marriage and never lived with them. Decedent did not adopt Sharon or Robert.

Donald Tedesco was the attorney who prepared decedent's will. He testified that in early 1988, he met with Margaret twice for the purpose of getting information to prepare wills for both Margaret and Frank. On February 18, 1988, both Margaret and Frank met with attorney Tedesco to discuss their wills. Margaret had a will executed in 1982, but to Tedesco's knowledge, Frank did not have a will prior to 1988, and there is no evidence in the record to suggest otherwise. At the meeting in February 1988, Margaret instructed Tedesco to leave her residuary assets to her children, Sharon and Robert. Frank appeared very uncertain about his testamentary wishes but instructed Tedesco to leave his residuary assets in a life estate to Margaret and the remainder after her life to his three nieces, Betty, Rose, and Helen. Tedesco prepared wills for each of them according to their instructions and mailed copies to them for review.

On March 24, 1988, Margaret came back to Tedesco's office and asked him to make changes to both her will and Frank's. She indicated that Frank wanted his will to be similar to hers: leave everything to her, but if she predeceased him, everything to her two children, Sharon and Robert. Tedesco made the changes but did not mail the changed versions to them. He met with them on April 5, 1988, for the purpose of executing both wills, at which time Margaret was in the hospital anticipating heart surgery. Tedesco went to the hospital, where Frank was visiting Margaret, so that they could execute their wills.

When Tedesco arrived at the hospital, both parties appeared to be alert and competent. Tedesco asked them to read their wills. He went out into the hallway to wait while they read and discussed the wills. Tedesco testified that on both occasions when he was with Frank and Margaret, he did not detect any discord between them, and he described their relationship as harmonious.

Margaret called Tedesco back into her room after approximately 15 minutes. Tedesco then asked his standard three questions to both Frank and Margaret individually. Frank responded affirmatively that

he had read his will, that he understood it, and that it was correct in all respects. Tedesco also told them that he could make any changes that were necessary before signing the wills, and he could come back another time to execute the wills if necessary. Tedesco and his wife, his ersatz secretary that day, witnessed both Frank's and Margaret's wills at the same time. Frank signed by himself without aid from anyone, after Tedesco indicated where he was to sign.

At the time of making and executing the wills, Tedesco had practiced law for over 30 years: His practice was approximately 50% probate work, and he had prepared over 1,700 wills, with 85% prepared for husbands and wives. It was Tedesco's usual and customary practice to allow and encourage spouses to read and discuss their wills together, outside of his presence, whether the wills were signed at his office or elsewhere, because he felt it is a family matter that should be discussed in private between the spouses. He found it very common for husbands and wives to have differences of opinion as to how their property was to be distributed. Tedesco did not have any difficulty talking to or communicating with Frank, but he described Frank as a quiet man, as opposed to Margaret, who was very talkative. To Tedesco, Frank appeared "regular in all respects." Tedesco did not see what he would call any undue influence on the part of Margaret over Frank.

Sharon testified next. She had lived in the same town as her mother and Frank since her marriage in 1961. During the three to four years before the wills were executed, she had visited them two to three times per week, plus seeing them on holidays and other special occasions. In April of 1988, her mother entered the hospital and, due to complications, was not released before her death in July 1988. For a year or two before her death, Margaret had driven Frank to doctor's appointments and anywhere else he needed to go, because he had failed his driver's license test. Since at least 1986, Margaret had written all of the checks to pay for their household bills and everyday living expenses, out of their joint checking accounts. After Margaret's death, Sharon took over this job, until a trust was established in 1989 wherein the Magna Bank became trustee for paying all of Frank's bills. Until her hospitalization, Margaret had done all of the family shopping, laundry, cooking, and cleaning and laid out Frank's clothes for him every day. She also prepared their yearly income taxes. Sharon admitted that Frank had trusted and had confidence in Margaret.

Frank's three nieces testified next. They had lost their father when they were young girls and had always looked up to Frank as a

father figure. They all lived in the same general area as Frank and had seen him on holidays and special occasions during the three to four years before his death. The power of attorney that had enabled them to prosecute the will contest for their mother, Frank's sister, had been drafted after a family conference between the three nieces and their mother, at which time they decided that Mrs. Tynan, Frank's sister, should have inherited from him. The nieces had each inherited, through joint tenancy, bonds with a face amount of $2,300, but at least one of the nieces stated that she had expected to be left more under Frank's will because he had made statements to that effect during his lifetime.

All of the nieces testified that Frank had gradually changed in the three or four years before his death. The main changes they noted were that Frank was more easily confused and more forgetful as the years went by. He also lost his sense of humor to some degree, was quieter than normal, seemed less interested in the world around him, and became more dependent upon Margaret.

The contestants rested their case after introducing the evidence depositions of three physicians. We will not summarize these depositions, however, because the trial judge found that the contestants had not proved that Frank lacked testamentary capacity on the date he signed the will, a finding that the contestants do not challenge on appeal. Therefore, the depositions of the doctors, going only to the issue of testamentary capacity, are irrelevant for the purpose of this appeal.

Sharon testified again, on behalf of the estate. She described her relationship with Frank as a typical father-daughter relationship. She did not feel that Margaret dominated Frank, because if he did not want to do something that she wanted him to do, he just did not do it. Margaret and Frank's relationship was good, although at times they argued. The remainder of Sharon's testimony deals with her lack of involvement in the execution of Frank's will and events after the will was executed. However, since the court did not find that Sharon had unduly influenced Frank, we will not reiterate those facts.

Robert West testified briefly, stating that he had maintained a close relationship with Frank over the years and considered Frank his father after his mother married him. (Robert's and Sharon's natural father died in an airplane accident in 1949.) Robert lived in Belleville between 1961 and 1979 and saw Frank and Margaret often. After he moved away in 1979, he continued to visit Frank and Margaret about once per month.

Everett Kassing testified that he was the trust officer at Magna Bank at the time Frank established an *inter vivos* revocable trust on

August 23, 1988. Mr. Kassing worked with attorney Don Tedesco to set up the trust to pay Frank's bills. Kassing had three meetings with Frank regarding the trust and met with Sharon as well. Overall, Kassing expressed the opinion that Frank generally knew what property he owned, who his relatives were, and who were the natural objects of his bounty, during the months of his meetings with Frank, which was after the will in question was executed.

The only other evidence presented was the discovery deposition of petitioner Antonia Tynan, who could not appear at the trial due to health problems. Her deposition testimony was that she had always maintained a close relationship with Frank, as had her daughters, and that she thought Frank would leave her something in his will. The reason for the will contest, in her opinion, was that she and her daughters had been close to Frank and felt that Frank should have "thought of" them in his will. She did not have any information that Margaret had ever dominated Frank.

The trial court entered an order stating: "[C]laimants had failed to adduce sufficient evidence to establish testamentary incapacity by a preponderance of the evidence. The case is at best evenly balanced so that the usual presumption requires a determination of the question in favor of the testator's capacity to make a will." The court further found: "[C]laimants have adduced sufficient evidence to establish testator's trust in and dependence on his wife who as substantial beneficiary was instrumental in procuring the preparation and execution of the will in her own and her children's favor. *** Thus, while it is clear *** no presumption of undue influence arises merely from the relationship of husband and wife [citation], [a] fiduciary relationship can be found to exist from the facts and circumstances of the case." The court cited *In re Estate of Henke* (1990), 203 Ill. App. 3d 975, 561 N.E.2d 314. The court found that a fiduciary relationship arose between Frank and Margaret "by virtue of the factors inherent in this case and not as a matter of law from the fact of marriage." The court stated: "The court is aware that influence obtained as a result of affection or kindness is not undue," but the court went on to state that it was "nevertheless equally aware that such influence is insufficient to rebut the presumption of undue influence," citing *In re Estate of Mooney* (1983), 117 Ill. App. 3d 993, 453 N.E.2d 1158. The court found no rational basis to distinguish the holding in *Henke* and found that, because the estate had not produced clear and convincing evidence to rebut the presumption of undue influence, the will could not stand.

The evidence relied upon by the court, as stated in the order, was that "Frank did not manage his own affairs [and] did not pay his own bills, his health was deteriorating and he was characterized as withdrawn and disinterested." Other factors were that Frank had not received any independent legal advice and he did not ratify "his purported decision to disinherit his family" after the will was executed; that all communications with the attorney who drafted the will were made in the presence of Margaret; and that the attorney did not discuss, explain, or read the changed will to Frank at the time it was executed. The court found that it had "no clearly convincing evidence of either Frank's purported change of heart or that the executed will was not in conformity with his prior indication to favor his nieces."

The estate and the respondents argue on appeal that the trial court should not have applied the presumption of undue influence to Margaret over Frank because the presumption does not make sense when applied to a spousal relationship. The petitioner argues that the court was correct in applying the presumption. It appears from our review of the law and from the cases cited by the parties that the particular issue presented by this case is one of first impression in Illinois. (See *Mache v. Mache* (1991), 218 Ill. App. 3d 1069, 578 N.E.2d 1253 (where decedent's children sought injunctive relief against decedent's second and legally separated wife, requesting the court to prohibit the wife from using funds transferred to her shortly before decedent's death); *Meeker v. Meeker* (1874), 75 Ill. 260 (where testator's children from a prior marriage raise the issue of undue influence by testator's third wife, but said case was prior to the development of a presumption of undue influence in will contests that appears to have first been pronounced by the supreme court in *Weston v. Teufel* (1904), 213 Ill. 291, 72 N.E. 908).) Specifically, both parties are asking us to decide if the four-tiered test for finding a presumption of undue influence in a will contest situation, as set forth in *In re Estate of Henke* (1990), 203 Ill. App. 3d 975, 561 N.E.2d 314, applies to spousal relationships. For reasons more fully detailed below, we do not believe that we have to decide this issue, because the facts in the case *sub judice* do not raise the presumption of undue influence.

We feel that it is proper to exercise judicial restraint and not decide the issue of whether the presumption applies to spouses when such a decision is not necessary in resolving the dispute in the case at bar. A sweeping refusal to allow the application of the presumption as to spouses of testators may cause an injustice under other facts and circumstances. Suffice it to say that the use of the presumption of undue influence must be applied with caution as to marital relationships,

because of the unique relationship between spouses and the importance of marriages in our society. It may be that, after further consideration of the presumption in other factual situations, the courts in Illinois may exclude the use of the presumption as applying to spouses, but we decline to do so in this case or at this time.

■ Turning now to the facts in *Henke*, a daughter was accused of unduly influencing her mother to make a will in her favor, to the exclusion of the testator's two grandchildren from a deceased son. The testator had a former will that would have provided the grandchildren with approximately $100,000. This court found:

> "A presumption of undue influence arises when a will contestant shows:
>
> ' "(1) a fiduciary relationship between testator and a person who receives a substantial benefit under the will (compared to other persons who have an equal claim to testator's bounty);
>
> (2) a testator in a dependent situation in which the substantial beneficiaries are in dominant roles;
>
> (3) a testator who reposed trust and confidence in such beneficiaries; and
>
> (4) a will prepared or procured and executed in circumstances wherein such beneficiaries were instrumental or participated." ' " (*Henke*, 203 Ill. App. 3d at 978, 561 N.E.2d at 316, quoting *Nemeth v. Banhalmi* (1984), 125 Ill. App. 3d 938, 960, 466 N.E.2d 977, 992, quoting *Beyers v. Billingsley* (1977), 54 Ill. App. 3d 427, 436-37, 369 N.E.2d 1320, 1327.)

Further research shows that the supreme court first raised the presumption of undue influence, with basically the same tests as set forth above, in will contests in *Weston v. Teufel* (1904), 213 Ill. 291, 72 N.E 908. Just one year prior to *Weston*, the supreme court in *Michael v. Marshall* (1903), 201 Ill. 70, 66 N.E. 273, had refused to apply the presumption of undue influence in will contests between family members, because "knowledge and experience teach that persons in confidential relations are very likely to be the beneficiaries of wills freely made, and of the most natural character." (*Michael*, 201 Ill. at 76, 66 N.E. at 275.) This court found in *Henke* that the contestants had established the presumption of undue influence by the evidence and reasonable inferences, but this court then found that the estate had presented sufficient evidence with which to rebut the presumption as a matter of law and found that the court as trier of fact had sufficient evidence with which to find the that there was no undue influence as

a matter of fact under the manifest weight of the evidence standard. *In re Estate of Henke* (1990), 203 Ill. App. 3d 975, 561 N.E.2d 314.

We must keep in mind that we are considering *undue* influence by a spouse. "Undue" influence means influence that is excessive, improper, or illegal. (See Black's Law Dictionary 1697 (4th ed. 1968).) "Undue influence has been defined as any improper urgency of persuasion whereby the will of a person is overpowered and he is induced to do an act which he would not do if left to act freely." (*Mache v. Mache* (1991), 218 Ill. App. 3d 1069, 1075, 578 N.E.2d 1253, 1257.) "The word 'undue,' when used to qualify influence, has the legal meaning of 'wrongful.' Hence 'undue influence' means a wrongful influence." (*Hurd v. Reed* (1913), 260 Ill. 154, 161, 102 N.E. 1048, 1050.) The question becomes what quality and quantity of evidence should be required before a wife of 34 years is presumed to have acted wrongfully?

Every marriage varies as to the intimacy between the spouses. However, we can properly assume that, in the vast majority of marriages, spouses influence each other for better or worse from the day they first date to the day they die or the divorce order is entered. We assume that good marriages involve give and take and compromises between spouses. The law does not and should not presume a spouse to be guilty of undue influence simply by reason of the marital relationship alone (*Miethe v. Miethe* (1951), 410 Ill. 226, 101 N.E.2d 571) or because the spouse has been able throughout the marriage to have considerable influence on her spouse. If this were the case, the closer the spouse becomes to his or her mate, the more it could be said that the spouse is excessively, improperly, and illegally influencing the testator. On the other hand, the more estranged the spouses become the more reasonable, proper, and legal is the influence directed toward the testator. The law should make sense.

In looking at the tests that raise the presumption of undue influence, as set forth in *Henke*, the complainant must first establish that a fiduciary relationship existed between the testator and the substantial beneficiary. Black's Law Dictionary defines a fiduciary as a person who manages money or property for another; one is said to act in a fiduciary capacity when one handles money or property which is not his or her own, or for his or her own benefit, but for the benefit of the other person. (Black's Law Dictionary 320-21 (abridged 5th ed. 1983).) Further:

> "[A] [fiduciary] relationship exists where there is a special confidence reposed in one, who by reason of such confidence, must act in good conscience and good faith and with due re-

gard to the interests of the person reposing such confidence. It may exist as a matter of law between attorney-client, guardian-ward, trustee-beneficiary, and the like, or it may be the result of a more informal relationship—moral, social, domestic or even personal in its origin. [Citations.] Where the relationship does not exist as a matter of law, the proof must be clear, convincing, and so strong, unequivocal, and unmistakable as to lead to but one conclusion." *Swenson v. Wintercorn* (1968), 92 Ill. App. 2d 88, 100, 234 N.E.2d 91, 97.

Petitioner had to prove, therefore, by clear and convincing evidence that a fiduciary relationship existed between Margaret and Frank. We first note that there was no evidence that Margaret managed money or property that belonged solely to Frank. There was evidence that Margaret paid the household bills and living expenses of *both* parties out of a joint checking account after Frank lost interest in doing so. Margaret also wrote the figures on the latest tax returns, but there was no evidence that she actually did all of the computations. (Frank was a retired bank auditor.) Most likely, in every marriage the chores are divided so that one spouse assumes the primary responsibility for seeing that checks are written and sent to pay the bills. If both spouses were to equally assume the responsibility, payment of bills could be overlooked, arguments might result as to whose turn it was to write the checks, and it becomes more difficult to know the bank balance. The same can be said for tax returns. It would be unusual for two people to split the job of filling out the returns. The mere fact that one party to the marriage does the routine management of the joint checking account from which the bills are paid, which may be small compared to the rest of the assets owned by the testator, as in the case at bar, and sees to the preparation of the tax returns does not and should not create a fiduciary relationship as to all of the property in testator's estate. There needed to be clear and convincing evidence that Frank entrusted the management of most of his personal and financial affairs to Margaret before a fiduciary relationship could be said to arise as to Frank's entire estate. (*Swenson v. Wintercorn* (1968), 92 Ill. App. 2d 88, 234 N.E.2d 91.) Since the record was devoid of evidence of any important or major decision Margaret made as to the management or disposal of any of Frank's property, we cannot find that the trial judge was justified in finding a fiduciary relationship between Frank and Margaret.

There is a further problem in raising the presumption of undue influence as to spouses in probate law. When we consider property transactions between spouses, the law does not place interspousal

transfers in the same category as in other cases. For instance, a conveyance between spouses is presumed to be a gift, and the presumption of undue influence is not applicable. (*Miethe v. Miethe* (1951), 410 Ill. 226, 101 N.E.2d 571; *Mache v. Mache* (1991), 218 Ill. App. 3d 1069, 578 N.E.2d 1253.) In fact, even if the grantee receives the entire estate of his or her spouse, the presumption of undue influence does not arise; rather, the presumption of a gift is indicated. (*Miethe v. Miethe* (1951), 410 Ill. 226, 101 N.E.2d 571.) It appears to be inconsistent to hold that Frank could make a permanent *inter vivos* conveyance of all of his property to Margaret at her insistence without raising the presumption of undue influence, but he could not make Margaret or her children contingent beneficiaries under his will without raising the presumption. It would seem that the opposite should be law when you take into account the finality of the acts. A testator can easily revoke the will prior to death, thereby defeating the undue influence, whereas a grantor cannot singlehandedly revoke a conveyance.

We also note that, in the first test for the presumption, there is included in parentheses the statement "compared to other persons who have an equal claim to testator's bounty." This phrase was first included in the test in *Beyers v. Billingsley*, 54 Ill. App. 3d at 436-37, 369 N.E.2d at 1327, but was not and has not been included in any supreme court cases. (See *Redmond v. Steele* (1955), 5 Ill. 2d 602, 126 N.E.2d 619; *Tidholm v. Tidholm* (1945), 391 Ill. 19, 62 N.E.2d 473.) In the case of a spouse, no one has a claim to a testator's bounty that is equal or superior to that of the surviving spouse. Our legislature has given preference to spouses through our laws of testacy and intestacy that totally ignore any question of undue influence by a spouse on a decedent. If a person dies without a will and without descendants, the entire estate goes to the spouse. (Ill. Rev. Stat. 1991, ch. 110½, par. 2—1(c).) If a person has left insufficient or no provision for his or her spouse through a will, the surviving spouse can renounce the will and is then entitled to one-third of the estate if there are descendants or one-half if there are not. (Ill. Rev. Stat. 1991, ch. 110½, par. 2—8(a).) These laws provide protection to persons from spouses who do not succumb to their influence during their life-time and try to cut them out of their estate via a will, and they protect surviving spouses from other relatives and creditors if the spouse dies without a will. The protections advanced by the legislature are in recognition of the special relationship shared by spouses. It is the peculiarly intimate nature of the relationship that deserves these protections and that

militates against a presumption of undue influence under the four factors of *Henke*.

Margaret had no equal, morally or legally, after 34 years of marriage, to her claim for testator's bounty. It is ironic that if Frank had predeceased Margaret there would not have been any dispute. Even if the will had been set aside because of undue influence by Margaret, Margaret would have inherited Frank's entire estate under the intestate laws. Frank's sister, brother, and nieces did not have a claim equal to Margaret's claim under the law as to Frank's bounty, and in fact, they had no claim until Margaret predeceased Frank.

The trial judge found that Sharon did not exercise any undue influence over Frank, but the trial judge stated that Frank had not ratified "his purported decision to disinherit his family." We can only infer from that statement by the trial court that the trial judge considered the nieces or their mother to have a claim to Frank's bounty superior to Frank's stepchildren. This finding that Frank's sister and her children had a better claim to Frank's bounty strictly because of blood relations was improper.

In *Redmond v. Steele* (1955), 5 Ill. 2d 602, 126 N.E.2d 619, the supreme court found that it was natural for the testator to leave his estate to his fiancee, who was his girl friend of 23 years, rather than to his brothers and sisters, who had been unkind to him. In *Nemeth v. Banhalmi* (1984), 125 Ill. App. 3d 938, 466 N.E.2d 977, the court found against testator's natural daughter and in favor of testator's stepdaughter in an action by the stepdaughter for malicious interference with an expectancy under a former will. A blood relationship between testator and the person excluded from the will can be considered, but a blood relationship in and of itself does not necessarily give the person a claim to testator's bounty which is superior to that of a person who is not directly related to the testator.

"Family" is defined primarily as "all the people living in the same house" and as "a social unit consisting of parents and the children they rear." (Webster's New World Dictionary 489 (3d coll. ed. 1988).) Sharon was 13 years old when Frank became her stepfather, and Sharon lived with Frank until she reached her majority. For 34 years, Sharon was, in effect, Frank's daughter. When Margaret died, Sharon was the one who came to Frank's assistance. While Robert was not as close to Frank as Sharon, still he visited often and remained in close contact. Robert was the only son that Frank had. There is nothing in the evidence that indicates that the petitioner and her daughters, who visited on holidays and anniversaries, should be considered as having a better claim to Frank's bounty than Sharon

and Robert. In fact, the record supports the opposite conclusion. Frank's "family" definitely included Sharon and Robert, and so Frank did not disinherit his family.

In our discussion of a fiduciary relationship, we have partially discussed the second test in *Henke* as to the testator being dependent on the substantial beneficiary, who is in a dominant role. The tests are interrelated, so that in order to establish a fiduciary relationship one needs to find a dependent situation. (*Nemeth v. Banhalmi* (1984), 125 Ill. App. 3d 938, 466 N.E.2d 977.) The mere fact that Margaret wrote the checks to pay the family bills after Frank lost interest did not make her dominant to Frank or place Frank in a dependent situation. There was no evidence in the record that Frank did not manage his own affairs, contrary to the trial court's finding. In fact, one of the nieces admitted on cross-examination that Frank had bought bonds periodically over a number of years with a face value totaling $2,300, excluding accumulated interest, in joint tenancy with each niece. Margaret did nothing to stop this practice and did not take any action to influence Frank to defeat the survival provisions in the bonds in favor of the nieces.

■ The mere facts that the testator's health was deteriorating, that he was characterized as withdrawn and disinterested, and that Margaret was talkative and outgoing, while being relevant, do not give rise to an automatic inference that she dominated the testator. The trial court specifically found that Frank had testamentary capacity. In fact, Frank apparently was in much better health than Margaret at the time the wills were executed, because the wills were executed at a time when Margaret was in the hospital for an illness from which she never recovered. The fact that Margaret had to drive, because Frank failed his driver's test, may have given Margaret some control over Frank, but chauffeurs do not necessarily dominate the will of their passengers. Margaret did the shopping, laundry, cooking and cleaning (Frank did vacuum occasionally) and laid out Frank's clothes for him every day. Surely, the fact that a wife or husband performs household chores and does personal things for the other spouse is not evidence of the spouse attempting to wrongfully gain influence over the other spouse. Further, all of these matters, if such are considered evidence of domination, raise the question, who dominated whom in this marriage? The trial judge viewed such evidence as a sign of weakness on the part of Frank, because Margaret assisted Frank in some of his physical and menial tasks. One could just as easily find from the evidence that Margaret was a devoted wife just giving tender, loving care to her husband of 34 years, while others might

even view the evidence as showing Margaret was a slave to Frank. We note that on really important matters, such as Frank's failure to adopt his stepchildren or what investments Frank made, there is no evidence that Margaret had any influence over Frank. The point is that there was no evidence showing a domination or control by Margaret over the mind of Frank. Even the petitioner, Frank's sister, admitted in her deposition that she had no information that Margaret dominated Frank.

There was evidence that Frank trusted and had confidence in Margaret. This third test, however, is probably the least important, because a presumption of undue influence could arise, if such presumption applies to marriages, even if the testator did not have trust and confidence in the spouse. For instance, the spouse suffering from the "battered woman syndrome" or whose physical impairments cause reliance on the other spouse may not have trust or confidence in the spouse, but a presumption might arise if the facts supported a finding that the other three tests had been met. A general statement by a witness that the decedent had trust and confidence in his spouse without specifying facts that show such trust and confidence and as to what aspects the decedent had such trust and confidence in his spouse is almost meaningless. Suffice it to say that there was no evidence that Frank had an unusual or extraordinary amount of trust and confidence in Margaret, especially when difficult and important decisions had to be made, nor was there any testimony, other than Margaret wrote the checks to pay the bills and she filled in the tax returns, to support the general statement and conclusion that Frank had trust and confidence in Margaret.

Finally, in reviewing the evidence in relation to the last test as to whether the will was prepared or procured and executed in circumstances wherein the beneficiaries were instrumental or participated, it is interesting to note that attorney Tedesco testified that although he felt Frank was hesitant and unsure about to whom he desired to leave his property if Margaret predeceased him, Frank did in the first meeting indicate that he desired to leave his property to his nieces. Margaret certainly did not prepare, control, and influence Frank prior to this meeting. Nor did Margaret raise any objections in this meeting to Frank's tentative contingent disposition of his property. There is no evidence as to what Frank and Margaret discussed afterwards. The only evidence is that Margaret at a later time told the attorney outside of Frank's presence that Frank wanted his stepchildren to be the beneficiaries if she predeceased Frank. It is only conjecture that Mar-

garet said or did anything to Frank to improperly influence Frank to change his mind as to who should be his contingent beneficiaries.

The mere fact that Margaret drove Frank to the law office for purposes of discussing a will does not raise a presumption of undue influence. (*Henke*, 203 Ill. App. 3d at 982, 561 N.E.2d at 319.) The facts that the attorney never discussed Frank's will outside of the presence of Margaret, that Frank changed his mind as to whom he desired to leave his property, and that Margaret conveyed to the attorney the message of Frank's change of mind as to the contingent beneficiaries are all important, when considered together, and are sufficient to meet the fourth test of *Henke* as to participation in procuring the will. The weakness in the conclusion to be drawn from these facts, however, stems from the lack of evidence needed to meet the prior tests. The total lack of evidence to show that Margaret dominated Frank causes Margaret's role in procuring the will to be less ominous.

From a procedural aspect, we are not sure if the trial court, at the close of petitioner's case, determined that the evidence was sufficient to raise the presumption of undue influence or whether the trial court considered all of the evidence in making such a determination. If the trial court considered all of the evidence, then the final difficulty in establishing the presumption of undue influence was the length of time and opportunity that Frank had to change his will after Margaret died. Sharon correctly anticipated that if she managed Frank's affairs the nieces would soon begin to question her motives. Sharon, therefore, contacted Frank's banker, and the banker and Tedesco set up the trust to pay Frank's bills. Frank participated in the discussions, agreed to a course of action, and established an *inter vivos* revocable trust. If Frank had not been satisfied with his will, he had an excellent opportunity for one year to amend such without Margaret's influence. (See *Hurd v. Reed* (1913), 260 Ill. 154, 102 N.E. 1048 (where the party accused of exercising undue influence returned to his home in Washington, leaving testator several months to change his will before his death).) While Frank may not have done anything formally to ratify the will, he certainly did so passively and informally.

Petitioner failed, even if we construe the evidence most favorably for petitioner, to present clear and convincing evidence to raise a presumption of undue influence by Margaret over Frank. Accordingly, we need not discuss whether petitioner proved undue influence without benefit of the presumption. Obviously, under the facts in this case, if petitioner failed to raise the presumption of undue influence, there

was no Thayer bubble for respondents to burst. Thus, petitioner failed to make a *prima facie* case of undue influence.

In light of the foregoing, the judgment of the circuit court is reversed, and we remand said cause to the trial court with directions to admit the will of Frank Glogovsek to probate.

Reversed and remanded with directions.

GOLDENHERSH and MAAG, JJ., concur.