FIRST DIVISION 

March 30, 2001

Nos. 1-98-3573, 1-98-4735 (consolidated)

FRED EYCHANER and BETTY LOU WEISS,

Plaintiffs-Appellants

v.

THEODORE GROSS and ROOSEVELT UNIVERSITY, an Illinois Not-For-Profit Corporation,

Defendants-Appellees, Counterdefendants-Appellees and Counterplaintiffs-Appellees

(Auditorium Theatre Council, an Illinois Not-For Profit Corporation,

Defendant-Appellant and Counterplaintiff-Appellant;

AUDITORIUM THEATRE COUNCIL, an Illinois Not-For-Profit Corporation, Fred Eychaner and Betty Lou Weiss,

Counterdefendants-Appellants)
.

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the 

Circuit Court of 

Cook County

No. 94 CH 11328

Honorable 

Aaron Jaffe,

Judge Presiding.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Plaintiffs, Fred Eychaner and Betty Lou Weiss, as directors of the Auditorium Theater

Council (Council) and the Auditorium Theatre Council, an Illinois not-for-profit corporation (ATC) (collectively referred to as plaintiffs) brought this action to prevent Roosevelt University (Roosevelt) and its president, Theodore Gross (collectively referred to as defendants), from transferring funds from the Auditorium Theatre (Theatre).  During the ATC executive board meeting on December 15, 1994, Gross presented a resolution to have a distribution from the Theatre of $1.5 million to Roosevelt to finance Roosevelt's new Schaumburg campus.  Gross stated:

"*** I'm saying that we need to do this because as I said at the outset it's the most important step the University has taken in its history.  And therefore, this is a primary project and the chief source of immediate cash is in the Auditorium Theatre.  That belongs to the University.  It does not belong to the Auditorium Theatre Council.  That is our legal interpretation of it.  The Auditorium Theatre Council can take whatever vote it wants to take in its January meeting.  We are going to access those funds, because we must have those funds in order for this project to go forward.  I mean, I have to take this hard line because we've reached the point now with with this fiction and it's a fiction, that the Auditorium Theatre Council, Inc. has some kind of legal authority over those funds.  They do not.  The Auditorium Theatre, Inc. was created for fund raising purposes only.  The Auditorium; those funds are University funds.  As much as the funds for any other unit of the University.  So that's our interpretation of it."  

ATC members objected to the transfer of funds and the meeting was adjourned in order to get an opinion from Roosevelt's counsel as to the legality of the transfer.   

Eychaner and Weiss brought suit the next day.  In the amended complaint they alleged: (1) Roosevelt placed the Theatre in a charitable trust for the benefit of the public with the Council and its successor, ATC, as trustee; (2) ATC has ownership rights to all funds and assets in the Theatre pursuant to the Illinois Charitable Trust Act (760 ILCS 55/1 
et seq.
 (West 1998)) and the Illinois General Not For Profit Corporation Act of 1986 (805 ILCS 105/101.10 
et seq.
 (West 1998)); (3) a constructive trust should be imposed on Roosevelt, allowing ATC to restore and operate the Theatre; and (4) Roosevelt should be estopped from preventing ATC from operating the Theatre.  Defendants brought a counterclaim seeking that Roosevelt be declared the sole and exclusive owner of the Theatre and alleging that Eychaner and Weiss breached a fiduciary duty to Roosevelt and ATC.  ATC brought a counterclaim against Roosevelt and Gross alleging (1) an express charitable public trust; (2) constructive trust; (3) breach of contract based on the 1960 resolution and standard operating procedures; (4) equitable estoppel; (5) breach of contract based on a 1993 letter of intent; (6) promissory estoppel; (7) unjust enrichment; and (8) director conflict of interest.  The trial court dismissed plaintiffs' causes of action and this court reversed and remanded for trial.  
Eychaner v. Gross
, Nos. 1-95-3614, 1-96-1412 cons. (1997) (unpublished order under Supreme Court Rule 23).

During the 10-week trial, the court heard testimony from 37 witnesses and reviewed

approximately 400 documents generating 98 volumes of transcripts.  On September 28, 1998, the court entered judgment in favor of Roosevelt and Gross on its counterclaim, denied plaintiffs' theories of relief and ATC's counterclaim, declared Roosevelt as the sole and exclusive owner of the Theatre, ordered an accounting, found Eychaner breached his fiduciary duty and reserved resolution of damages against Eychaner until after the accounting.

On September 29, 1998, the court ordered that control of the Theatre be immediately turned over to the Auditorium Theatre of Roosevelt University (AT of RU), created by Roosevelt to take over and operate the Theatre.  On September 29, 1998, plaintiffs filed an interlocutory appeal of the September 28, 1998 order (appeal No. 1-98-3573) and on October 13, 1998, filed an amended appeal of the orders from September 28 and 29.  On December 2, 1998, the trial court denied plaintiffs' motion to stay trial court proceedings, ordered the accounting of the Theatre's financial status to proceed, scheduled a damages hearing against Eychaner and scheduled a Rule 137 hearing (155 Ill. 2d R. 137).  On December 22, 1998, plaintiffs filed an interlocutory appeal from the December 2, 1998, order (appeal No. 1-98-4735).  We consolidated these appeals.

                                                          I. BACKGROUND

In the 1950s, Roosevelt considered undertaking restoration of the Auditorium Theatre.  The board of trustees of Roosevelt (Board) initially rejected creating a separate not-for-profit corporation for restoration because Roosevelt did not want to relinquish control of the Theatre.  In 1959 in order to generate revenue to restore the Theatre, the board of trustees established the "Auditorium Restoration and Development Committee" (ARDC) made up of Roosevelt's Board, faculty and community members.  The Board approved an ARDC fund-raising proposal conditioned upon Roosevelt retaining ownership and control of the Theatre.

ARDC recommended to the Board formation of a separate organization and used attorney Elmer Gertz to draft a resolution stating the organization's mission and responsibilities concerning the Theatre.  On January 21, 1960, Gertz sent a draft of a resolution to Kenneth Montgomery, Roosevelt's attorney and stated in an accompanying letter:

"As a result of a good deal of discussion between certain

officers and members of the board of Roosevelt University and the executive committee of the Auditorium Restoration and

Development Committee, a draft of the resolution has been agreed upon ***.  It is the consensus of all involved in this situation that it is best not to form any separate corporation, foundation, trust or other legal entity, but to proceed in the manner set forth in the resolution."

Gertz testified that he chose not to create a formal legal entity to avoid becoming "too technical, too bound down in detail" and because "it might defeat our purpose of raising funds and restoring the Theatre and operating it.  We were against anything that was too rigid in form." Gertz also wanted to preserve real estate and tax exemptions for the Theatre.  Regarding public fund-raising, Gertz testified "that their funds would go not at all to the University, but to the Theatre project and that Roosevelt would have no right to interfere with the rehabilitation or running of the Theatre after it was built."  

On February 18, 1960, the Board passed the resolution that governed Theatre restoration and allowed formation of the Council.  Montgomery told the Board that although the University "might be required in the public's interest to hold the Auditorium in readiness for public use for some considerable period," "*** the Council's power originated from the Board and the Board could deactivate the Council."  Montgomery described the Council as an "agency" formed to operate and restore the Theatre.  However, the resolution gave broad authority and responsibility to the Council in areas of maintenance, operation, and  fund-raising.

Gerald Gidwitz and Jerome Stone were trustees present at the February 18, 1960, meeting and they testified that Roosevelt never intended to relinquish any authority or ownership in the Auditorium Theatre.  Gidwitz testified that Roosevelt permitted a group of volunteers to assist in the restoration of the Theatre rather than giving them ownership, stating: "if the [Roosevelt Board] didn't like what was happening, in ten minutes they could dissolve the [Council's] Board and fire the whole bunch."  Stone testified that the Board intended to retain authority to abolish the Council.  Gertz, however, testified that based on the resolution Roosevelt could not abolish the Council unless the Council failed in its mission to restore the Theatre.  Gertz stated:

"It was understood that the university could not change its mind, as long as the purpose was being accomplished.  First of all, the funds had to be raised, and secondly, the restoration had to take place, and then the theatre had to be operated as a cultural institution in the best interest of the city and community of Chicago *** if there was a failure, then the university was free to step in, but it didn't fail."

In a letter to the Internal Revenue Service (IRS) Montgomery sought a determination that contributions to the Theatre via the Council would be tax deductible.  Montgomery told the IRS that "contributions to the Council are, in fact, contributions to it [Roosevelt] because the Council is its agent."  The IRS responded that contributions to the Council would be tax deductible to the donor because "it appears that contributions to the Council will inure entirely to your [Roosevelt's] benefit such contributions will be considered contributions to you."

Harland Allen chairman of the board of trustees of Roosevelt University issued a press release on March 8, 1960 describing the restoration process of the Auditorium Theatre and stated: "The University's trustees have been impressed by and are fully cognizant of the public trust which the ownership of the Theatre has imposed upon them."  Chairman Allen and Mrs. Spachner who was Council chairman and a member of Roosevelt's Board asked Robert Ahrens to draft a Seven-Point statement to clarify plans for Theatre restoration and operation.  Robert Ahrens testified that the Seven-Point statement paraphrased the resolution and did not change its terms.
  The statement indicated that the "[Council] will have full authority and responsibility for the restoration campaign and for the operation of the theatre." 

The Council began its restoration campaign.  Gertz testified that some people would not contribute to the Theatre unless they were assured that the funds would go only to the Theatre and not to Roosevelt.  Other donors wanted assurances that Roosevelt would have no right to interfere with Theatre restoration and operation.  A brochure distributed by the Council told potential donors that Roosevelt would not control a restored Theatre but that the Council would manage and operate the Theatre after the completed restoration.  Bruce Sagan, William Peterson, and Gerald Stanton testified that they donated money to the Council because they believed the Council would manage and operate the Theatre independent from Roosevelt.  Other testimony at trial indicated that Roosevelt's power to abolish the Council at any time was communicated to potential donors. 

The restored Auditorium Theatre opened on October 31, 1967, with the Council undertaking day-to-day operations.  During a four-year period, Roosevelt and the Council negotiated an operating procedure or "agreement."  On March 4, 1971, Roosevelt and the Council approved "Standing Policies and Operating Procedures for the Auditorium Theatre" (SOP) confirming the February 1960 resolution, noting both university and public uses for the Theatre, and preserving Roosevelt's real estate tax exemption because the University's use of the property was deemed "primary."   The SOP contained procedures for the day-to-day operation of the Theatre, including maintenance of bank accounts, documentation of receipts, and payroll of Theatre staff.  

During the 1960s and 1970s, donations to the Theatre were made pursuant to Roosevelt's tax-exempt status and number.  Some members of the Council believed that fund-raising would improve if the Council secured its own tax-exempt status from the IRS.  The Council sought to establish a corporation for this fund-raising purpose, approved articles of incorporation and sent them to the Board for approval.  Roosevelt's attorney Gorman provided a memo to the Board regarding the corporation:

"If the Board of Trustees approves the establishment of a new

corporation, the [Council] will exist in two legal capacities.  In one capacity it will continue to exist as it has in the past as an

unincorporated agency of Roosevelt University operating under, and

subject to, the direction and control of the Board of Trustees of

Roosevelt University.  ***  In its other legal capacity the [Council] will exist as an Illinois not-for-profit corporation in accordance with the Articles of Incorporation and By-laws submitted.  ***  [T]he

corporation will exist and be used for the solicitation of funds only.  It will not affect in any way whatsoever the operations of the Theatre Council and the Auditorium Theatre which will continue in the same manner as in the past." 

In September of 1981, ATC was incorporated pursuant to the Illinois General Not For Profit Corporation Act and filed its bylaws with the Attorney General.  The articles of incorporation were identical to the articles that the Board approved in 1979 and limited the function of the corporation to fund-raising.  The bylaws filed with the Attorney General which defendants contend differ from the bylaws approved by the Board state that ATC's purpose was to "restore, modernize, and operate the Auditorium Theatre *** so that it will serve as a cultural center for the people of Chicagoland, with particular reference to the performing arts."  The bylaws required ATC to create standing committees to oversee the Theatre restoration and operation.  The bylaws required that 25% of the members of ATC's executive committee be trustees, officers, or faculty of Roosevelt.  In contrast to these broad powers, paragraph 4 of the bylaws described ATC's power in terms consistent with the articles of incorporation and stated that ATC was organized "for the sole purpose of raising funds for the Auditorium Theatre Council, an independent board of Roosevelt University."  This paragraph also stated that "[ATC] has no function in connection with the restoration, operation, use and maintenance of the Auditorium Theatre other than to raise funds for such activities. The responsibility to restore, operate, use, and maintain the Auditorium Theatre resides solely with the Board."

In 1983 the parties revised the 1971 SOP which is substantially similar to the original SOP, noting that the purpose of the Council is to maintain and to continue to restore the Theatre "for the benefit of faculty and students of Roosevelt, and subject to academic priorities of the University, to make artistic, cultural and educational contributions to the people of greater Chicago through the sponsorship of events in the performing arts."  The 1983 SOP also stated that the sole purpose of ATC is to solicit funds for the Theatre. 

On July 12, 1989, Ed Weil, the chair of the Council and ATC, proposed that Roosevelt lease the Theatre to ATC for $1 a year and that ATC conduct fund-raising independent of Roosevelt.  President Gross and the Board rejected this proposal and passed a resolution requiring ATC to report to Gross regarding "budgetary and general operating matters."  In response to these events, 17 members of the Council and ATC resigned.  The resignations threatened the Theatre's production of 
Phantom of the Opera
.  Gross, university officials, Council and ATC members compromised and resignations were rescinded.  In return for the Council and ATC receiving assurance of independence from Roosevelt, Gross was elected chairman of the Council and ATC. 

On August 1, 1989, John Blew, secretary of the Council, acknowledged that Roosevelt owned the Theatre but wanted to disband the Council and transfer all operating authority to ATC.  Roosevelt rejected this proposal.  In 1993, Roosevelt and ATC discussed other proposals including the execution of a license agreement between Roosevelt and ATC and the effect of any transfer on ATC's tax-exempt status.  ATC in a letter asked the IRS about the tax-exempt status of ATC if it took over Theatre operations.  The letter acknowledged that the Council previously operated the Theatre, that the Council constituted a "separate, unincorporated unit within the University," and that following any transfer to ATC, Roosevelt officials or trustees would constitute a majority of ATC's board.  In June 1994, the IRS responded that "the proposed transfer of operation of the Theatre from the Council to you [ATC] will not adversely affect your exempt status under 501(c)(3) of the Code."

Both the Council and ATC had similar names, and had the same members, officers, directors, and bylaws.  In August 1989, Gross became the chairmen of both organizations.  Many members of the Council and ATC were unaware that there were two organizations.  The Council took no official action to transfer or delegate any right to operate the Theatre to ATC.  Roosevelt did not approve transfer or delegation of the right to operate the Theatre from the Council to ATC and did not amend the 1979 resolution prohibiting ATC from operating the Theatre.

ATC’s attorneys recommended that the Council negotiate with Roosevelt a formal ratification of ATC’s operation of the Theatre.  On March 25, 1993, Roosevelt issued a letter of intent setting forth the proposed terms of a license agreement between Roosevelt and ATC.  On April 1, 1993, ATC authorized the payment of $200,000 to Roosevelt and agreed to continue to negotiate regarding a license or lease. The parties dispute if the payment was for rent or was a contribution.  ATC subsequently made another $200,000 payment to Roosevelt.  The trial court found that these

payments were a "proper distribution back to the parent, Roosevelt."  ATC did not accept the terms of the letter of intent because the proposed lease or license gave Roosevelt 8 of 11 seats on the ATC board.

A year later, ATC officer Gordon Newman proposed disaffiliation of ATC from Roosevelt except for a lessor-lessee relationship and that ATC would contribute $1 million for the purchase of a campus in Schaumburg.  Gross expressed his continued desire for Roosevelt to maintain several seats on the ATC board.  The parties, however, did not agree to this proposal.   Both Newman and Ed Weil, a former chair of the Council and ATC, testified that the Council and ATC attempted to license or lease the Theatre because these organizations lacked control.

In mid-1994, ATC offered to purchase the Theatre for $1 million from Roosevelt but the offer was rejected.  On November 15, 1994, ATC offered to purchase the Theatre for $3 million, which Roosevelt again rejected.  During a December 15, 1994, meeting of the ATC executive committee, Gross presented a resolution to have a distribution from the Auditorium Theatre of $1.5 million to Roosevelt to finance Roosevelt's new Schaumburg campus.  ATC members objected to the transfer of funds, and the meeting was adjourned pending the receipt of an opinion from Roosevelt's counsel regarding the legality of the transfer.  

The next day Eychaner and Weiss brought this lawsuit asserting that the demand by Gross for the transfer of $1.5 million of Theatre funds circumvented the following procedure established in the 1960 resolution describing how and when Theatre funds could be transferred to Roosevelt:

"(12) *** [A]ny surplus resulting from the operation of the Theatre be retained in a development reserve, and that when an adequate sum, as determined by the Executive Committee of the Council in consultation with the Executive Committee of this Board, has been accumulated, any amount above that reserve be transferred to the unrestricted funds of the University."  

In 1995, the Roosevelt board of trustees terminated all rights and duties that were ever granted to the Council and ATC and created the Auditorium Theatre of Roosevelt University (AT of  RU) to operate, restore, maintain and fundraise for the Theatre.    

                                         II. STANDARD OF REVIEW

Plaintiffs claim that because the written 1960 resolution is at issue and "historical circumstances surround the resolution," this court should conduct a 
de novo
 review.   Defendants argue that the trial court heard testimony, made credibility findings and made several findings of fact in its 75-page order and that when reviewing a trial judge's factual finding, the court's decision should be sustained unless it is against the manifest weight of the evidence. 
 
The issues raised in the pleadings required the taking of evidence, witness testimony, and resolution of conflicts of fact. 
 Several issues also raised legal questions, including the construction of documents and the legal effect of a given set of facts.  Therefore, this case presents mixed questions of law and fact, and the proper standard of review is the clearly erroneous standard
. 
 City of Belvidere v.
 
Illinois State Labor Relations Board
, 181 Ill. 2d 191, 205 (1998).

III. EXPRESS CHARITABLE TRUST 

Plaintiffs contend that the February 18, 1960, resolution, together with the surrounding circumstances, created a charitable trust with the Council and its successor, ATC, as trustee  in charge of restoring, operating, and maintaining the Theatre. A trust is a fiduciary relationship by which one or more entities hold trust property, subject to an equitable obligation to keep or use such property for the benefit of another.  Restatement (Second) of Trusts §§2, 348 (1959).  Charitable trusts have similar characteristics as private trusts, and the methods for creating both types of trust are the same.  Restatement (Second) of Trusts §349, Comment 
a
 (1959).  However, charitable trusts need not specify definite beneficiaries and are perpetual. Restatement (Second) of Trusts §365, Comment 
a
 (1959).  In Illinois, the creation of a valid trust requires the following: "(1) intent of the parties to create a trust, which may be shown by a declaration of trust by the settlor or by circumstances which show that the settlor intended to create a trust; (2) a definite subject matter or trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specification of a trust purpose and how the trust is to be performed; and (6) delivery of the trust property to the trustee." 
 In re Estate of Zukerman
, 218 Ill. App. 3d 325, 329 (1991).

Plaintiffs recognize, when the settlor does not use the word "trust," the settlor 
must have manifested intent to create a trust. 
 Kavanaugh v. Estate of Dobrowolski
, 86 Ill. App. 3d 33, 40 (1980); see also Restatement (Second) of Trusts §351 (1959) ("A charitable trust is created only if the settlor properly manifests an intention to create a charitable trust"); G. Bogert, Trust & Trustees §324, at 374 (2d 
ed. 1991) ("In order to create a charitable trust the settlor must have evidenced an intent to have that relationship").  
Plaintiffs rely on cases they claim are analogous because the courts found a charitable trust even though there was no express document or use of the word "trust" or "trustee" by the settlor.  See, 
e.g.
,
 Riverton Area Fire Protection District v. Riverton Volunteer Fire Department
, 208 Ill. App. 3d 944, 950 (1991)
 
(traditional trust documents not required for charitable trust.) 

The 1960 resolution which plaintiffs contend created a trust directs the Council to raise funds for the Theatre's restoration, to supervise the restoration, to hire staff, and to enter into contracts.  The resolution also places the Council in a fiduciary position and restricts its discretion for the public's benefit.  Defendants argue that the resolution contains no reference to a "settlor," a "trust," or a "trustee" and that the resolution gave the Council authority to supervise and restore the Theatre for the benefit of Roosevelt.  Defendants contend that, pursuant to the resolution, the Council had the responsibility to "safeguard the right, title, interest of the University in and to the theatre."  Defendants endorse the trial court's conclusion that Roosevelt intended to create a committee agency relationship with ATC.  We find legal and factual errors in the trial court's resolution of the charitable trust issue.

A. INTENT

The trial court erroneously relied upon facts not in evidence to negate the element of intent and to support its finding of an intent to create a committee agency relationship.  The court in addressing the question of intent stated: "Roosevelt's intentions were quite clear as evidenced by statements made by Roosevelt trustees at the 1960 Resolution meeting.  Mr. Pollak, a Roosevelt board of trustee member, proposed an amendment to be added to the 1960 Resolution stating: 'It is the intent of this resolution that the Auditorium Theatre Council be regarded as having been created by the Board of Trustees of Roosevelt University; that its Executive Council and members are responsible to the Board; and that the Board of Trustees of the University has the power and responsibility to remove from office the Council or its Executive Committee.' "  Relying on statements made by Roosevelt board of trustees' members and the Pollak amendment, the court concluded "that it was the intent of the Roosevelt's Board of Trustees, to create a committee/agency relationship with the ATC."  The court's reliance on that amendment in determining the intent of the Board was factually erroneous since the Pollak amendment was rejected.

The trial court legally erred when analyzing the element of trust intent by taking the narrow view that Roosevelt could only create a trust by acting through its board of trustees and by dismissing statements made by individuals as immaterial to trust intent.  As erroneously noted by the trial court: "Besides statements made by individuals are immaterial and that only through its Board of Trustees could Roosevelt create a trust.  The only one that could create an express trust was Roosevelt acting through its Board of Trustees.  They never did so."  The conclusions of the trial court that statements made by individuals are immaterial and that Roosevelt could only create a trust by acting through its Board demonstrate a basic disregard for the legal principle that the intent of the parties to create a trust may not only be shown by a declaration of trust by the settlor, but may be indicated "by circumstances which show that the settlor intended to create a trust."  
Zukerman
, 218 Ill. App. 3d at 329.  Here the record contains evidence of declaration of trust intent by individuals who were agents of Roosevelt together with circumstances which show the intent to create a trust.  Statements made by individuals regarding trust intent are not immaterial when those individuals are agents of Roosevelt.  Rejection of that evidence by the trial court was legally erroneous.  Moreover, the court erred when it failed to consider circumstances which show an intent to create a trust and limited its consideration to actions of the Board.     

Robert Ahrens, an assistant to president Sparling and later director of development at Roosevelt University, testified that Roosevelt's president Sparling told him that "we" hold the Theatre in trust for the community.  Harland Allen, chairman of the board of trustees of Roosevelt, issued press releases in which he spoke of the public trust.  Mrs. Spachner, a Roosevelt trustee and chairman of the Council, at a contract signing spoke of the trust in which the Auditorium Theatre was held.  We note that these individuals included Roosevelt's president Sparling and other Board members or agents of Roosevelt and the court erred in rejecting these statements made by agents of Roosevelt as being immaterial. 

Additional evidence considered irrelevant or immaterial by the trial court included words demonstrating trust intent.  Defense expert professor John Langbein indicated that words like "authorize" and "empower" are words of trust, and those are exactly the words communicated to the public in advertising, in brochures and statements that sought donations from the public.  Plaintiffs' exhibits 72 and 73 were identified by Ahrens as widely distributed brochures titled "Why the Restoration of the Auditorium Should Concern You" which stated: "Will Roosevelt University then control and operate the restored Auditorium?  No.  Roosevelt University has empowered the Auditorium Theatre Council to manage it on a nonprofit basis."  We note these brochures used for fund-raising listed the names of Harland Allen, Gerald Gidwitz and Jonathon Pugh who were members of Roosevelt's board of trustees and members of the Council.  Harland Allen was chairman of Roosevelt's board of trustees.  The 
Talmanac
, published by Roosevelt board trustee, Jonathan Pugh, with Roosevelt's approval, was also distributed to the public and discussed the separation of the Theatre project from Roosevelt.  It referenced the fact that Roosevelt gave the right to restore and operate the Theatre to an independent body.  In analyzing the element of trust intent, the court erred in dismissing these communications and statements as immaterial.

Other circumstances that demonstrate trust intent were not properly considered by the court, including evidence of trustee independence and discretion.  Both professor John Langbein and professor Richard Epstein indicated that one of the hallmarks of a trust is that the trustee has independence and broad discretion to carry out the trust purpose.  The Seven-Point statement authorized by Spachner and Roosevelt's chairman Harland Allen described the broad discretion and the full and exclusive authority of the council to restore and operate the Theatre and to manage the proceeds from the Theatre.   

The trial court also erred in refusing to admit into evidence various articles.  While the court rejected these articles as hearsay, we conclude they should have been admitted to the extent that they contained statements against interest made by Roosevelt or to prove the effect of the articles on the listener, here members of the public.  The court admitted into evidence the press release statement (PX 41) of Dr. Sparling President of Roosevelt University from March 12, 1960 regarding the resignation of several Roosevelt trustees as the result of the adoption of the February 18, 1960 Resolution, but refused to admit the Chicago Daily News article (PX 42A) generated as a result of Sparling's press release.  On March 12, 1960 the Chicago Daily News reported on Sparling's press release in an article, "Roosevelt U. Chief Defends Restoration; Theatre Could Serve Both City, University: Sparling."   The article correctly quoted Dr. Sparling regarding fund-raising for the Theatre and the University as stating: "The campaigns -- under different auspices -- will be kept totally separate.  Only by choice will those who wish to support both art and education be given an opportunity -- and a challenge -- to do so."  The plaintiffs offered the article based on the press release to show what the public was told about restoration and fund-raising for the Theatre and about Roosevelt's relationship to the Theatre. 

Similarly, the court admitted into evidence the March 8, 1960 press release statement

(PX 37) of  Harland Allen, the chairman of the board of trustees of Roosevelt University regarding the plan for restoring and operating the Theatre, but refused to admit into evidence newspaper articles (PX 38A, 39) generated by Allen's press release.  The Chicago Daily news reported on Allen's press release on March 8, 1960 in the following article, "Roosevelt Trustees Map $350,000 Drive in Deficit."(PX 38A).  The article quoted Chairman Allen as stating that the
 
University is fulfilling a "public trust" by restoring the Theatre and that the Council is free "from here on in *** to add to its present membership" from outside the University family.  The plaintiffs offered this article to show what the public was told about Roosevelt's intent and the relationship of the parties based on the Roosevelt press release.  In Allen's press release (PX 37) he stated: "The University's trustees have been impressed by and are fully cognizant of the public trust which the ownership of the Theatre has imposed upon them."  The Chicago Tribune on March 8, 1960 reported on both press releases made by Sparling and Allen in an article headlined "Roosevelt U. Going Ahead On Fund Drive."(PX 39).  The Daily News and Tribune articles were not admitted into evidence.  (PX 42A, 38A, 39)  

The court admitted into evidence the Seven-Point Statement (PX 57) a press release jointly issued on April 5, 1960 by Roosevelt Chairman Allen and Mrs. Spachner, who was chairman of the Council and a member of Roosevelt's board, but refused to admit into evidence newspaper articles based on the Seven-Point Statement.  The Chicago Sun Times on April 6, 1960 reported on the Seven-Point Statement in an article titled, "Roosevelt U., Theater Council Clarify Plans For Auditorium," (PX 60A) and the Chicago Daily News, on April 6, 1960 reported on the Statement in an article, "Auditorium Theater Plan Told *** Statement Clarifies Policy."  (PX 61)  The Sun Times and Daily News articles were not admitted into evidence.

Plaintiffs argue that these articles were admissible as to what the public was told about Roosevelt's intent and the relationship of the parties.  The court found plaintiffs' reliance on these statements "faulty and misguided" and did not consider the evidence finding it "double and triple" hearsay.  We note that the newspaper articles which the court did not allow into evidence were generated as the result of specific press releases, or statements made by Roosevelt through
 
Sparling, Roosevelt's President or Allen, Roosevelt's chairman of the board of trustees.  Roosevelt knew press releases are relied upon by the press.  While the court rejected these articles as hearsay, they were admissible in order to prove the effect of the articles and statements on the listener, here various members of the public.  M. Graham, Cleary & Graham's Handbook of Illinois Evidence section 801.5, at 726-27 (7th
 ed. 1999).  The effect of these articles is one of the circumstances that the court erroneously failed to consider when determining the issue of intent.  If the statements distributed to the press by Roosevelt and then relied upon by the press were intended by Roosevelt to motivate the public to contribute money to the Theatre as the result of communicating the intent to use the money not for Roosevelt University, but for the purpose of restoring, operating and maintaining the Theatre, then that circumstance should be considered in determining Roosevelt's intent and the relationship of the parties.

We further note that the articles specifically quoted Sparling and Allen from their press releases.  Such statements were relevant to intent and to the relationship of the parties.

By rejecting the statements attributed to Sparling and Allen as hearsay, the court failed to recognize the exception to the hearsay rule which makes admissible statements of a party or attributed to a party which are inconsistent with the position of that party at trial.  
Bafia v. City International Trucks, Inc.
, 258 Ill. App. 3d 4, 9-10 (1994).  The statements militate against
 
Roosevelt's position but were not properly considered by the trial court as admissions against interest.  By not admitting the newspaper articles, specifically generated by Roosevelt's press releases the trial court failed to consider what the public was told about Roosevelt's intent and the relationship of the parties by Roosevelt's use of the print media.

In addition, the trial court's analysis of intent ignores the testimony of Gertz, Dressel, Ahrens, Peterson, Stanton, Sagan and other witnesses regarding communications to donors who testified they relied on these communications in connection with fund-raising.  For example, Peterson testified he relied on newspaper articles and Council brochures when donating to the Theatre and he told potential donors the Theatre was separate from Roosevelt.  Regarding public fund-raising, Gertz testified "that their funds would go not at all to the university, but to the theatre project, and that Roosevelt would have no right to interfere with the rehabilitation or the running of the theatre after it was rebuilt."  The trial court recognized that "there exists thirty eight (38) years of documented history between the parties which define the roles and relationships of the parties."  However, regarding the issue of trust intent, the trial court failed to consider the effect on the public of the information Roosevelt published and the Council published with Roosevelt's approval to solicit donations during that 38-year history. 

The court erred in not considering two letters from former Roosevelt president Pitchell to Jonathan Pugh as admissions by a party opponent.  Pugh was a member of the Roosevelt board of trustees and the Council.  In 1964, Pugh published the 
Talmanac
 to explain the restoration process.  This article described the Council as a new body, "which possesses the right to restore, operate and manage the Auditorium Theatre as a civic enterprise, hold it separately from all other funds and use it solely for that purpose."  President Pitchell wrote two letters in response to the publication of the 
Talmanac
.  Pitchell described the 
Talmanac
 as an "excellent piece of work" and believed it would be a "major factor" in the success of the restoration of the Theatre.  These letters, therefore, were admissible to show that Roosevelt's president approved of the characterization of the Council's role as described in the 
Talmanac 
and approved of the article as a fund-raising tool for Theatre restoration.

Both professor Langbein and professor Epstein indicated the separation of liability was a hallmark of trust intent.  Both agreed that insulating the settlor from liability was an important attribute of a trust. Hartray, the project manager and architect for the restoration, and Izenour, one of the foremost experts in the world on Theatre design, both testified that no work could be done unless the Council had cash on hand so that Roosevelt would not be financially obligated.  Both professor Langbein and Epstein agreed that one hallmark of a trust is durability.  Langbein noted that a charitable trust is almost always perpetual.  Epstein pointed to factors in the resolution that demonstrated durability.  The factors addressed by the 1960 resolution, including the governance structure of the Auditorium Theatre Council, the need for annual reports and the mechanics for distribution of surpluses, all demonstrate the intent to create a long-term relationship.  The original bylaws and the corporate bylaws adopted in 1981 indicate that the Council would continue indefinitely to serve the Chicago community through the Auditorium Theatre as a cultural center.  The standing policies and operating procedures from 1971 and 1983 confirmed the 1960 resolution and provide evidence of durability which demonstrated trust intent.

The court failed to properly consider evidence of durability and separation of liability as circumstances which demonstrated the intent to create a trust. 

B. A DEFINITE SUBJECT MATTER OR TRUST PROPERTY

The trial court found that "the Theatre cannot be the corpus of the trust because Roosevelt held title in the Theatre since it purchased it in the 1940's and safeguarded its right, title, and interest since that time."  Plaintiffs acknowledge Roosevelt is the owner of the Theatre. The plaintiffs do not contend that the Theatre is the corpus of the trust, but that the right to operate, restore and maintain the Theatre constitutes the corpus of the trust.  The trial court was legally mistaken in its conclusion that although the 1960 resolution granted the right to operate, restore and maintain the Theatre to the Council, those rights could not constitute the corpus of the trust:

"To define the 1960 Resolution as creating a trust means

that this Court would have to find the corpus of that trust is not the Theatre itself, but the right to operate, restore and maintain the Theatre, because those are the rights therein granted.  No Illinois cases could be found where the corpus of any trust was a right, rather than tangible property.  Hence, Plaintiff's notion of an express trust also fails for lack of a tangible corpus because to find that a trust is created by granting the right to operate, maintain and restore the Theatre would potentially give any party charged with such duties property rights in the property at issue."

Contrary to the trial court's faulty legal conclusion, the Restatement (Second) of Trusts provides that intangible interests can be held in trust.  Restatement (Second) of Trusts §82 (1959) ("Interests in intangible things, if transferable, can be held in trust").  Intangibles, including control rights and possessory interests in real property, can be held in trust.  Moreover, plaintiffs correctly point out that maintenance, restoration, and operation of the Theatre for an indefinitie period (until the Council's mission fails) constitute possessory interests the subject of property that may be held in trust.  See, 
e.g.
,  
Burke v. Burke
, 259 Ill. 262, 268 (1913) ("In general, any right, interest or thing which may be the subject of property may be granted in trust.  Every kind of vested right which the law recognizes as valuable may be transferred in trust").  Both experts agreed that restoring and operating the Theatre qualifies as a charitable trust purpose and that the trust property can be a possessory interest in real estate.  
Defendants do not dispute that intangible interests can be held in trust.  Rather, defendants argue that the 1960 resolution does not demonstrate the intent to transfer control and operation of the Theatre from Roosevelt to the Council.  According to defendants, the resolution delegated responsibility to the Council to supervise the restoration process; it did not transfer any interest in the Theatre to the Council. 

We note that the trial court's conclusion that Roosevelt never intended to place the Theatre in trust with the Council acting as trustee addressed the intent of Roosevelt regarding the Theatre, but failed to address whether Roosevelt intended to place the operation, maintenance and restoration of the Theatre in trust.  The question of the intent regarding the corpus of the trust cannot be properly determined where as here the trial court failed to recognize what legally constitutes the corpus of the trust.  We find no factual or legal support for the trial court's conclusion that the restoration, operation, and maintenance of the Theatre could not serve as the corpus of a charitable trust.  The right is the subject of property, is vested, and is valuable; thus, it can be part of the corpus of a trust. 
 Burke
, 259 Ill. at 268.  The trial court's faulty legal conclusion that the right to restore, maintain and operate the Theatre could not be the corpus of an express charitable trust was clearly erroneous.  

C. DELIVERY OF THE CORPUS OF THE TRUST

The trial court's basic misunderstanding of the law concerning the corpus of the trust was repeated in the court's analysis of the delivery of the trust corpus as demonstrated by the following conclusion reached by the trial court: "Third, the trust also fails for lack of delivery of the corpus of the trust.  The documents presented as evidence to the court, specifically reserve, in Roosevelt, the right, title and interest in the Theatre.  The plaintiffs have failed to show that Roosevelt has ever relinquished these rights."  In rejecting the fact that the right to operate, restore and maintain the Theatre could constitute the corpus of the trust, the court incorrectly analyzed the issue of delivery of the trust corpus.  We note it was the right to operate, restore and maintain the Theatre, and not the right, title and interest in the Theatre, which plaintiffs alleged to be the trust corpus.  The court's conclusion that Roosevelt never relinquished right, title and interest in the Theatre was accurate but could not be relied upon as proof of lack of delivery of the corpus of the trust, because the alleged trust corpus was the right to restore, operate and maintain the Theatre.  The Restatement (Second) of Trusts provides that intangible interests can be held in trust.  Restatement (Second) of Trusts §82 (1959).  

Moreover, both experts agreed that the right to restore and operate the Theatre qualifies as a charitable trust purpose.  The record demonstrated delivery of the alleged trust corpus by evidence that, for almost 40 years, the Council and ATC restored and maintained the structure of the Theatre, contracted for performances, sold tickets to the general public, and operated the day-to-day activities of the Theatre.  
By failing to recognize that the trust corpus could be the restoration, maintenance and operation of the Theatre, the trial court ignored evidence of the delivery of that alleged trust corpus.     

                              D. OTHER TRUST ELEMENTS 

We note that the trial court did not further analyze the other elements of a trust, concluding "that any further discussion as to ascertainable beneficiaries, a specification of trust purpose and delivery of trust property to the trustee are all mooted by this court's finding that there is no express trust between the parties."  With that approach the trial court failed to consider a variety of circumstances that indicate trust intent contrary to the recognized principle of law that proof of intent may be demonstrated by surrounding circumstances.  
In re Estate of Zukerman
, 218 Ill. App. 3d 325, 329 (1991).  Defense expert Langbein acknowledged that both the background facts and the subsequent conduct of the parties would bear on the intent of the parties.  The court ignored evidence that the public was a beneficiary.  The court ignored evidence from both experts that the right to maintain, operate and restore the Theatre is a valid charitable trust purpose.  The court failed to consider circumstances which demonstrate the settlor intended to create a trust as to the operation, restoration and maintenance of the Theatre.

The settlor's intent is inextricably related to the trust corpus.  The issue is whether the settlor had an intent to create a trust regarding a specific corpus.  Intent cannot be determined without analyzing intent as to a specific corpus.  Intent does not exist in a vacuum.  The law recognizes that proof of intent may be demonstrated by "circumstances which show that the settlor intended to create a trust."  
In re Estate of Zukerman
, 218 Ill. App. 3d 325, 329 (1991).

The trial court erroneously rejected the fact that the right to operate, restore and maintain the Theatre could be the corpus of the trust, therefore the circumstances surrounding the intent regarding that corpus were never properly considered.  Based on the legal and factual errors regarding the intent, the corpus of the trust, the trust purpose, and the delivery of the corpus of the trust, the trial court's conclusion that there is no express trust is clearly erroneous.

E.  EXPERT TESTIMONY

Defendants' expert, John Langbein, testified that Roosevelt never intended the 1960 resolution to create an express trust.  Plaintiffs' expert, Richard Epstein, testified that the 1960 resolution established a trust relationship.  The trial court has discretion in admitting expert opinion and its decision will not be reversed absent an abuse of discretion.  
Wiegman v. Hitch-Inn
 
Post of Libertyville, Inc.
, 308 Ill. App. 3d 789, 799 (1999).
 The critical inquiry is whether the expert's legal testimony aids the trier of fact by explaining a factual issue beyond the trial court's ordinary knowledge or whether the opinion merely recites a legal conclusion. 
 Mache v. Mache
, 218 Ill. App. 3d 1069, 1077 (1991).  Both experts gave opinions on factual issues surrounding the parties' intent and their testimony aided the trier of fact in resolving this complex issue.  Therefore, we reject plaintiffs' argument that the trial court abused its discretion in admitting this testimony.

IV. COMMITTEE/AGENCY

Plaintiffs argue the trial court erred in finding a committee agency relationship and contend that the Resolution did not characterize the Council as an agency or a committee.  Plaintiffs note that, unlike any committee of Roosevelt, the Council and its successor, ATC, have their own bank accounts, fiscal year, contracts, administrative public relations staff, and accounting records.  Plaintiffs argue Roosevelt did not have the right to control the manner in which the Council acted and the conduct of the Council did not legally bind Roosevelt.  The Resolution attempted to limit Roosevelt's liability and the SOP expanded  the Council's independent power, including the power to enter into contracts and to fund Theatre projects.  In compliance with the Resolution all contracts for performances at the Theatre were signed by the Council, provided for payment only from the Council's separate funds, and protected Roosevelt from liability for any reason.  Paragraph 6 of the Resolution required ATC to place an exculpatory clause in contracts with third-parties stating, "contracting parties will look only to the Restoration Fund for payment and not to any other fund of the University."    

Whether parties create an agency relationship is a factual determination properly made by the trial court. 
 Martini v. Heinhold Commodities, Inc.
, 163 Ill. 2d 33, 47 (1994).  The court examines the relationship between the principal and agent to see if the principal exercised control over the agent (
Knapp v. Hill
, 276 Ill. App. 3d 376 (1995)) and whether the agent's actions subject the principal to liability.  
Taylor v. Kohli
, 162 Ill. 2d 91, 95 (1994). 
 We note that the defendants' expert, Langbein, characterized the fund-raising and day-to-day operation of the Theatre as an agency relationship.  The trial court in considering whether Roosevelt intended to create a trust or an agency relied on Langbein's testimony indicating: "The Court found Professor Langbein to be far more qualified than Professor Epstein to opine on the subject of trusts."  For the reasons previously discussed, we cannot say the factual and legal errors which formed the basis of the court's analysis regarding the trust issue did not erroneously cause the court to find a committee agency relationship. 

V. PLAINTIFFS ALTERNATIVE CLAIMS

Plaintiffs contend the trial court erred in finding that the ATC was not the successor to the Council, and regarding their claims of constructive trust, breach of contract, equitable estoppel, and promisory estoppel.  It is unnecessary to address these alternative theories because we are remanding the charitable trust claim for the reasons previously discussed.  

VI. JURISDICTION

Defendants challenge the jurisdiction of this court to review certain parts of the orders from September 28 and 29, 1998.  These orders are: (1) the liability finding against Eychaner for breach of a fiduciary duty; (2) the trial court's denial of ATC's money claims for unjust enrichment and breach of contract for failure to negotiate in good faith; and (3) the trial court's denial of ATC's conflict of interest claim.  Plaintiffs claim this court has jurisdiction over all of these orders pursuant to either Supreme Court Rule 301, 304(a), or 366 (155 Ill. 2d Rs. 301, 304(a), 366).  Defendants also contest this court's jurisdiction for appeal No. 1-98-4735 from the December 2, 1998, order.  Plaintiffs contend that this court has jurisdiction pursuant to Supreme Court Rule 307 (155 Ill. 2d R. 307).

Appellate jurisdiction is limited to review of final judgments unless an order falls within a statutory or supreme court exception. 
 Cavanaugh v. Lansing Municipal Airport
, 288 Ill. App. 3d 239, 242 (1997).  A final judgment is one that fixes absolutely and finally the rights of the parties in the lawsuit on all issues of litigation and disposes of the entire controversy; it is final if it determines the litigation on the merits so that, if affirmed, the only thing remaining is to proceed with the execution of the judgment.  
P&A Floor Co. v. Burch
, 289 Ill. App. 3d 81 (1997). Further, an order is final where matters left for future determination are merely incidental to the ultimate rights that have been adjudicated by the order.  
In re Petition to Incorporate the Village of Greenwood
, 275 Ill. App. 3d 465, 470 (1995);
 Deckard v. Joiner
, 44 Ill. 2d 412, 417 (1970).

Plaintiffs rely on Supreme Court Rule 301 (155 Ill. 2d R. 301) as a basis for this court's jurisdiction.  Rule 301 applies only to a final judgment that disposes of the entire controversy between the parties.  
Mostardi-Platt Associates, Inc. v. American Toxic Disposal, Inc.
,
 
182 Ill. App. 3d 17, 19 (1989).  The September 28, 1998, order gave control of the Theatre to Roosevelt, denied plaintiffs and ATC's claims for relief, found that Eychaner breached a fiduciary duty to Roosevelt, ordered an accounting of the Theatre's finances and reserved a damage determination against Eychaner until "the accounting has been completed and reviewed by [the trial court]."  Plaintiffs claim that the order regarding the accounting and damage determination are merely incidental to the trial court's judgment and do not render the judgment nonfinal.
  The ruling against Eychaner only addresses liability and is not a final judgment because damages were reserved for future decision therefore we lack jurisdiction regarding the Eychaner order.  
Ariola v. Nigro
, 13 Ill. 2d 200 (1958) (order requiring damages determination is not final or appealable); 
Lindsey v. Chicago Park District
, 134 Ill. App. 3d 744, 747 (1985) (an order that only rules on liability and reserves the issue of damages for later determination is not final); 155 Ill. 2d R. 301.  
 Rule 304(a) applies only to an appeal "from a final judgment as to one or more but fewer than all of the parties or claims."  155 Ill. 2d R. 304(a).  Rule 366 defines the court's scope of review and outlines its powers in an appeal. 155 Ill. 2d R. 366.  Therefore, before the appellate court proceeds under Rule 366, it must have appellate jurisdiction either because of a final judgment or because of a statutory or supreme court rule exception. 
 Cavanaugh
, 288 Ill. App. 3d at 242.  The trial court's determination that Eychaner breached a fiduciary was not final because while it decided the controversy between the parties on the merits it did not establish "their rights, so that, if the judgment is affirmed, nothing remains for the trial court to do but to proceed with its execution." 
 In re J.N.
, 91 Ill. 2d 122, 127 (1982).  Before any judgment can be executed against Eychaner, there must be a damage determination.  Moreover, no other statute or supreme court rule affords appellate jurisdiction to review this nonfinal order.  Therefore, we lack jurisdiction under Rules 304(a) and 366 to review the finding that Eychaner breached a fiduciary duty to Roosevelt.  

We note that this finding against Eychaner is dependent upon the erroneous findings and conclusions previously discussed.   Roosevelt's claim is that Eychaner breached his fiduciary duty to Roosevelt by opposing the transfer of $1.5 million from the Theatre to Roosevelt.  Eychaner maintains his opposition was consistent with his fiduciary duty.  The jurisdictional problems together with our conclusion that the case be remanded for resolution of the charitable trust claim, which is inextricably linked to the agency issue, preclude us from substantively addressing the trial court's finding that Eychaner breached a fiduciary duty owed to Roosevelt.  Moreover, our reversal and remand of the charitable trust claim and the related trust accounting precludes the trial court from proceeding on the damages hearing regarding the breach of fiduciary duty finding against Eychaner until the charitable trust issue and the nature of the relationship between the parties is resolved.  The correct approach was taken by the trial court in its order of September 28, 1998, regarding the damage determination against Eychaner which was "reserved *** until the accounting has been completed and reviewed." 
   

In this case, the trial court made only part of its judgment immediately enforceable.  The September 28, 1998, written order and decision required the Council and ATC to turn over control of the Theatre to Roosevelt, barred the Council and ATC from operating and controlling the Theatre, and ordered an immediate accounting of Theatre operations.  On September 29, 1998, the trial court made an express written finding making these orders immediately enforceable.  Defendants do not dispute this court's jurisdiction over these judgments within the orders.

Plaintiffs contend that Rule 304(a) confers appellate review upon the order denying ATC's money claim for unjust enrichment and failure to negotiate in good faith and the order denying ATC's claim of conflict of interest against Roosevelt.  We note Rule 304(a) states as follows: 

"If multiple parties or multiple claims for relief are involved

in an action , an appeal may be taken from a final judgment as to one or more but fewer than all of  the parties or claims if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both.  Such a finding may be made at the time of the entry of judgment or thereafter on the court's own motion or on motion of any party."  155 Ill. 2d R. 304(a).

The trial court adjudicated the counterclaims brought by ATC, however, unless the trial court included Rule 304(a) language with these orders we have no jurisdiction over them.  
Puleo v. McGladrey & Pullen
, 315 Ill. App. 3d 1041, 1046-47 (2000) (order can only be appealed under Rule 304(a) "if the trial court in its discretion, determines that an immediate appeal would be desirable and makes the necessary Rule 304(a) finding").  See also 
In re Application of Du Page County Collector
, 152 Ill. 2d 545, 550-51 (1992).  Here, the trial court did not make the necessary Rule 304(a) finding when it dismissed ATC's counterclaims.  Specifically, the September 28, 1998 order that dismissed these claims makes no reference to the enforceability or appealability of this judgment.  Therefore, Rule 304(a) does not confer appellate jurisdiction over the trial court's denial of these separate claims brought by ATC.  Based on the  record, the orders the trial court made immediately enforceable were the orders requiring the Council and ATC to turnover control of the Theatre to Roosevelt, terminating the Council and ATC from operating and controlling the Theatre and requiring the accounting.    

Plaintiffs alternatively argue that the orders denying unjust enrichment, failure to negotiate in good-faith and conflict of interest are subject to review because they involve the same claims as the orders that contain the Rule 304(a) finding.  Under Rule 304(a), the trial court makes a discretionary determination that a final order that disposes of some, but not 
all
 of the controversy in a multi-party or multi-claim case should be immediately enforceable and appealable.  
Puleo
, 315 Ill. App. 3d at 1047.  In this case, by making some but not all orders in this multi-claim case immediately enforceable, the trial court determined that appeal should be limited only to those orders which it made enforceable.  
Puleo
, 315 Ill. App. 3d at 1047.  In the context of this case, if the trial court wanted to make each and every order immediately appealable, as plaintiffs suggest, Rule 304(a) required a specific finding as to each order.  The claim involving unjust enrichment and failure to negotiate in good-faith sought money damages only.  The conflict of interest claim sought to eliminate the effect of any vote by a Roosevelt officer or trustee on matters involving the ATC and Roosevelt under section 108.60 of the General Not For Profit Corporation Act of 1986 (805 ILCS 105/108.60
 (West 1998)).  Based on this record, we conclude that the court's orders concerning unjust enrichment, failure to negotiate in good-faith and conflict of interest do not substantively involve the same claims as the court orders concerning operation and control of the Theatre and requiring an accounting.  Therefore, pursuant to Rule 304(a), we have jurisdiction over the September 28 and 29, 1998, orders barring the Council and ATC from operating the Theatre, granting Roosevelt the immediate control of the Theatre, and ordering an accounting.  We do not have jurisdiction as to the trial court's orders regarding unjust enrichment, failure to negotiate in good-faith and conflict of interest.   

VII. CONCLUSION

As related to appeal No. 1-98-3573, the orders of the trial court barring the Council and ATC from operating the Theatre, granting Roosevelt immediate control of the Theatre and ordering an accounting are reversed and remanded.  This reversal and remand of the charitable trust claim and the trust accounting precludes the trial court from proceeding on the Eychaner damages hearing for the reasons previously discussed.  

Based on lack of jurisdiction, we dismiss the appeal of the trial court's liability finding against Eychaner, denial of ATC's money claims for unjust enrichment and failure to negotiate in good-faith and denial of the conflict of interest claim.

For the reasons previously discussed, the defendants' motions to dismiss, strike and vacate as related to appeal No. 1-98-4735 which were taken with the case are moot.

Reversed in part and dismissed in part; cause remanded.

CAHILL, P.J., specially concurring.

WOLFSON, J., dissenting.

PRESIDING JUSTICE CAHILL, specially concurring:

I concur in the decision to reverse and remand this case for a new trial.  Respectfully, I do not agree with the overview of the record set out in the thoughtful dissent.  There are too many questions raised by the trial court's opinion and order to conclude that the trial of this case was fair.  The record in this case is not just a mountain of conflicting evidentiary material amassed over the course of a 10-week trial.  If that were so, I would agree with the dissent and defer to the able trial judge.  I write separately to stress issues discussed in the opinion and to raise one of my own.

In the course of his lengthy opinion and order the trial judge:

(1.)  Misstated the law governing trusts and misunderstood several arguments made by the plaintiffs based on the law of trusts;

(2.)  Ignored unrebutted evidence that the Auditorium Theater Council was incorporated in 1981 and so functioned well before and for some time after this law suit was filed;

(3.)  Discounted (inexplicably, in my view) unrebutted evidence that the incorporated Auditorium Theater Council raised money for, restored and operated the theater.  The Council entered into contracts in its own name.  Nonetheless, the trial court concluded that the Council was nothing more than a committee of Roosevelt University (the dissent calls it an "instrumentality" (slip op. at 38)) without a life of its own.  The conclusion of the trial judge that the Council was incorporated simply for tax purposes ignored substantial evidence to the contrary and was, in my view, against the manifest weight of the evidence.  Finally, Roosevelt University never offered a plausible explanation for the statement of one of its lawyer-advisors early on (cited in the opinion (see slip op. at 7)) that the Council "will exist in two legal capacities."  The evidence is persuasive that Roosevelt University chose this murky legal position so that later it could affirm or deny whatever legal label might be advanced to describe the Council.  The story about the duck is appropriate here.  If the entity is incorporated and behaves like a corporation, it probably is a corporation; and

(4.)  Midway through his opinion and order the trial judge paused awhile to comment on the character of one of the party plaintiffs and assigned a base motive to the filing of this lawsuit.  It is a distressing interlude in an opinion and order that otherwise sticks to the record.  The words chosen by the trial court are gratuitous and strident–an editorial that suddenly appears in the middle of a straight news story.  There is nothing I can find in the record that supports the trial court's view that the lawsuit was filed for less than legally sound motives.  It may be that the trial court's remarks were prompted and justified by witness demeanor or other trial circumstances not revealed in a dead cold transcript.  ("Yes," he smirked.)  

The problem for a reviewing court is clear–without references to the record, we cannot know whether the trial judge was expressing justified irritation with behavior edging toward the contumacious or trial court bias harbored from the outset.  If the latter, I would not hesitate to vote to reverse on that ground alone and remand for a new trial before a new judge.  The issue is in doubt based on my reading of the opinion and order.  The trial judge is able and distinguished.  I hope we will not need to struggle with this issue in the future.

JUSTICE WOLFSON, dissenting:

This lawsuit has gone on for more than four years.  There has been a prior appeal, after tortuous motion practice in the trial court.  The bench trial took about 10 weeks.  I would not send the case back for another trial.

The controlling issue in this case is whether the purported settlor intended to create a trust.  
In re Estate of Zuckerman
, 218 Ill. App. 3d 325, 329 (1991).  Another issue, interesting but not controlling, is whether the right to operate, restore, and maintain the Theatre can be the corpus of a trust.

No trial is perfect.  This one had its share of imperfections.  For example, I cannot understand why the judge allowed himself to be lectured on the law of trusts nor do I see how law professors are in a position to determine the ultimate factual issue of the settlor's intent.  Maybe some of the exhibits that were excluded should have been admitted, but I cannot see the relevance of newspaper articles on the issue of intent when they are offered for some purpose other than their truth.

At any rate, the evidence, including the exhibits the judge declined to consider, does not lead inexorably to the success of the plaintiffs' position.  The test for the judge's factual 

determinations is whether they are supported by the manifest weight of the evidence.  
In re Estate of Zuckerman
, 218 Ill.  App. at 330.  That is, after looking at all the admissible evidence, even, for purpose of argument, the newspaper clippings, can we say a conclusion opposite that of the trial judge is "clearly evident?"  
Fieldcrest Builders, Inc. v. Antonucci
, 311 Ill. App. 3d 597, 604 (1999).  If we cannot say that, we are engaging in impermissible second-guessing.

I do not agree the trial judge's finding of a lack of intent to create a trust rests on his apparently mistaken view that intangible rights cannot be the corpus of a trust.  The judge's

first finding that there was no such intent had nothing to do with the corpus issue.

He relied heavily, in my view correctly, on the February 18, 1960, resolution, the minutes of the meeting that produced that resolution, and the January 21, 1960, letter of Elmer Gertz,

ACT's lawyer, to Roosevelt's lawyer.  Gertz said:

"It is the consensus of all involved in this situation that it is best not to form any separate corporation, foundation, 
trust
, or other legal entity, but to proceed in the manner set forth in the resolution."  (Emphasis added.)

He also said: "The resolution expresses the full intent of all concerned."  The word "trust" does not appear in the resolution.  Admittedly, it does not have to be there to create a trust, but its absence, given the sophisticated level of the players, is hardly an endorsement for the plaintiffs' view.

One can examine the 1960 resolution, the other admissible documents, and the behavior and statements of the parties and their agents, and then make an honest argument for either

side--intention to create a trust, lack of intention to create a trust.   

Roosevelt and everyone else clearly understood people would give more money to the Theatre if they thought the school was not getting it.  Behavior was driven by tax laws and the urgency of fund-raising, not by any desire to establish a trust.  We should not disregard the judge's analysis of the admissible evidence.

Lack of a permissible corpus was a second, alternative reason offered by the trial judge.  It is not the 
sine
 
qua
 
non
 of his decision.  I should add that I am not all that certain the right to operate, restore, and maintain the Theatre can be the corpus of an express trust.  At least, no Illinois case goes that far.  
Burke v. Burke
, 259 Ill. 262 (1913), cited by the majority, concerned the real estate of a testator after termination of a life estate.  "There is no uncertainty about the subject-matter of the trust," said the court.  
Burke
, 259 Ill. at 269. Here, there is.

Clearly, the corpus of a trust can be an intangible thing.  Restatement (Second) of Trusts  §82 (1959).  That same section notes that intangible things such as the good will or trade mark

of a business cannot be the subject of a trust apart from the transfer of the business.  See Restatement (Second) of Trusts §82, Illustration 2 (1959).  It seems to me a case can be made for the conclusion that Roosevelt never surrendered control of the business.  The 1960 resolution is replete with attempts by Roosevelt to maintain control of Theatre operations.  Under the circumstances, the right to operate, restore, and maintain the Theatre is, for trust corpus purposes, vague, amorphous, and ephemeral.

The "intangible thing" issue aside, I would hold the trial judge's conclusion that Roosevelt did not intend to create a trust at all is not against the manifest weight of the evidence.  There is no good reason to send back the case.

Nor do I see any merit to the plaintiffs' other, fallback positions.

It cannot be a constructive trust.  A constructive trust is  an equitable remedy which will be imposed on proceeds of a breach of fiduciary duty.  
Baumgartner v. First Church of Christ, Scientist
, 141 Ill. App. 3d 898, 908 (1986).  There is no clear and convincing evidence of an identifiable fund traceable to a breach of a fiduciary duty in this case.  See 
In re Estate of Franke
, 124 Ill. App. 2d 24, 31 (1970).  The other claims made by plaintiffs--breach of contract, equitable estoppel, promissory estoppel, unjust enrichment, and director conflict of interest--cannot be taken seriously.

I do not believe we should end litigation just because it has gone on for a long time and everybody's interests would be served by a resolution.  I do believe, however, we should not strain to find a reason to return to go.

Because there is enough admissible evidence to support the trial judge's view that this was a takeover attempt by an instrumentality of Roosevelt University, I would affirm his

conclusion that there is no trust.

I respectfully dissent.