**NOT RECOMMENDED FOR FULL TEXT PUBLICATION**
File Name: 07a0300n.06
Filed: May 1, 2007

**No. 06-5805**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DAVID FREIBERT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| MERRILL LYNCH BUSINESS FINANCIAL | ) | |
| SERVICES, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

**BEFORE: GRIFFIN and MERRITT, Circuit Judges, and LAWSON, District Judge***

**DAVID M. LAWSON, District Judge.** Plaintiff David Freibert pledged the assets in his brokerage account as collateral for a loan made by defendant Merrill Lynch Business Financial Services (MLBFS) to Glencoe Pizza Services, LLC (Glencoe), a company in which Freibert had a minority interest. The managing member of Glencoe, Bruce Coe, also pledged his own brokerage account as collateral for the loan. After the loan went into default and MLBFS applied the brokerage account assets to satisfy the debt, Freibert filed suit alleging *inter alia* that MLBFS breached a fiduciary duty to Freibert when the allocation of the collateral as between the two pledged accounts

---

*The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

disfavored Freibert. The district court dismissed the case, finding that Freibert failed to plead facts establishing a fiduciary duty on the part of the defendant. We find that Illinois law, which governs this case, generally views the relationship between a creditor and a third-party pledgor as an ordinary debtor-creditor relationship from which no fiduciary duty arises. Because we conclude that the plaintiff has pleaded no facts that take this case away from the general rule, we will affirm the district court's order of dismissal.

I.

According to the allegations in the complaint, plaintiff Freibert, Bruce Coe, and others were members of Glencoe, which owned and operated several Papa John's pizza franchises. In 1997, defendant MLBFS loaned Glencoe $300,000. As a condition of making the 1997 loan, MLBFS required the plaintiff to pledge his registered securities as collateral in a brokerage account with Merrill, Lynch, Pierce, Fenner & Smith (Merrill Lynch), which is a corporate affiliate of defendant MLBFS. The plaintiff therefore opened a brokerage account with Merrill Lynch and deposited securities valued at approximately $300,000.

On August 8, 1997, the plaintiff executed a Financial Assets Security Agreement (1997 pledge agreement) with MLBFS in which Freibert granted "a continuing first lien and security interest" in his brokerage account assets to secure payment of "all present and future obligations, liabilities and indebtedness" of Glencoe. The pledge agreement prohibited Freibert from "directly or indirectly withdraw[ing] any financial assets or other property from the Securities Account" unless MLBFS gave its "prior written consent." The pledge agreement "continue[d] in effect so long thereafter as the Loan Agreement shall be in effect or there shall be any Obligations outstanding."

The agreement also contained a choice-of-law provision directing application of Illinois law. J.A. 26-27, 30.

Between August 1997 and December 1998, MLBFS extended additional credit to Glencoe under the 1997 loan agreement. By January 1, 1999, Glencoe owed the defendant approximately $1.2 million. The value in Freibert's brokerage account by then was over $900,000.

On January 6, 1999, Glencoe borrowed approximately $3 million from Fleet Business Credit and used some of the money to pay the full balance of the 1997 loan from the defendant. However, Freibert was not notified of this transaction and did not learn of it until March 2003. He contends now that the full payment of the loan terminated his 1997 security agreement and entitled him to a release of the defendant's encumbrance on the assets held in his brokerage account.

But on January 12, 1999, Glencoe entered into a new loan agreement with MLBFS, in which it agreed to extend $750,000 in credit to Glencoe. Again, the plaintiff was not aware of this transaction, which was engineered by Coe. That same day, Coe telefaxed the plaintiff a single signature page for what turned out to be a new pledge agreement. The plaintiff signed the page and returned it to the defendant, believing it was related to the 1997 pledge agreement and the earlier Glencoe loan. He alleges that he was unaware that he had just signed a new financial assets security agreement in favor of the defendant.

Under the terms of the 1999 pledge agreement, the plaintiff again pledged his Merrill Lynch brokerage account, this time to secure payment of the entire 1999 Glencoe loan, which, as noted above, was arranged by Coe without the plaintiff's knowledge. Coe apparently signed a similar agreement pledging his Merrill Lynch brokerage account assets as well. Like the 1997 agreement,

the 1999 pledge agreement prohibited the plaintiff from withdrawing assets from the account without written permission. It also required the aggregate of the plaintiff's and Coe's securities accounts to meet a minimum value equal to between 115% and 125% of the maximum line of credit under the loan agreement (collateral threshold). If the account value dropped below the threshold, MLBFS retained the right to demand that the accounts be fortified, failing which they could be seized. As before, MLBFS could take control of the collateral if Glencoe filed for bankruptcy. The agreement also contained the following provision:

> 9. Rights Absolute. The rights of MLBFS hereunder and with respect to the Collateral are absolute and unconditional, and nothing that MLBFS does or leaves undone shall affect such rights of MLBFS. Without limiting the foregoing, MLBFS shall not as a condition of such rights be required to resort to any other collateral or security, pursue or exhaust any remedy against Grantor, Customer or any other party or observe any formality of notice or otherwise (except as expressly provided herein); and (ii) [sic] Grantor hereby consents to, and waives notice of, any extension, renewal or modification from time to time of the Loan Agreement [to Glencoe] or any other agreement, instrument or document evidencing or securing the Obligations, any extensions, forebearances, compromises or releases of any of the Obligations, and the release of any party primarily or secondarily obligated for the Obligation or of any other collateral therefor.

J.A. 43-44. As with the first agreement, the 1999 pledge agreement was to "be governed in all respects by the laws of the State of Illinois." J.A. 46.

Merrill Lynch signed a document labeled, "Acknowledgment and Confirmation" in which it promised to hold Bruce Coe's brokerage account as an agent for the defendant and not to let Coe make withdrawals without the defendant's consent. Parts of the document are not legible, but the record does disclose the following terms:

> [W]e agree to hold the Collateral on behalf of and as agent for and subject to the [illegible] and control of MLBFS. We further agree that (i) we will allow purchases

of financial assets included in the Collateral only to the extent permitted by Paragraph 3 of the Security Agreement, (ii) except as expressly permitted by the Security Agreement, we will not without the prior written consent of MLBFS directly or indirectly permit any withdrawal of funds, financial assets or investment property from said Securities Account by anyone other than MLBFS and (iii) unless permitted by law or the order of a judicial body having appropriate jurisdiction, we will comply with any written orders or directions of MLBFS with respect to said Securities Account or Collateral, notwithstanding any dispute or contrary order or direction of Grantor or any other party.

J.A. 52.

After the 1999 pledge agreements were signed, Glencoe began drawing on the new line of credit extended until it had exhausted the full $750,000. About two years later, between September and November 2001, Merrill Lynch allowed Coe to withdraw approximately $150,000 in excess collateral from his securities account without the written consent of the defendant, even though that action contravened the pledge agreement and Merrill Lynch's Acknowledgment and Confirmation. The plaintiff alleges that Coe's withdrawal of excess collateral took the aggregate value of the accounts below the collateral threshold. The plaintiff states he was never notified of this withdrawal, but the defendant insists that nothing in the 1999 Freibert pledge agreement required such notification.

Six months later, in early July 2002, Richard Park, a financial advisor at Merrill Lynch, informed the plaintiff and Coe that the aggregate value of the two securities accounts had dropped approximately $16,000 below the collateral threshold. Apparently, an overall decline in the securities markets had impacted significantly the value of the marketable securities in the accounts, but the reduction caused by the market would not have put the aggregate value below the threshold if earlier Coe had not withdrawn collateral from his account. The plaintiff was informed that Merrill

Lynch would liquidate the assets in the accounts and remit the proceeds to the defendant if the aggregate value of the accounts was not increased above the collateral threshold. The plaintiff alleges that he was never given this information in writing, as required by the pledge agreement. Coe was unable to increase the value of his account, so the plaintiff deposited $20,000 into his brokerage account to raise the aggregate value of the accounts to meet the collateral threshold.

On July 23, 2002, Mr. Park again verbally informed the plaintiff that the aggregate value of the accounts had fallen approximately $42,000 below the collateral threshold. Once again, no written notice was given. The plaintiff instructed Mr. Park to liquidate the marketable securities in his account to prevent continued devaluation of the assets below the threshold. The next day, on July 24, 2002, Mr. Park informed the plaintiff that the aggregate value of the accounts had dropped to $48,592 below the collateral threshold. The plaintiff deposited that amount into his brokerage account. The aggregate value of the accounts thereafter remained above the threshold.

In December 2002, Glencoe filed for chapter 11 bankruptcy protection. The filing constituted an event of default under the note and security agreements. In August 2003, pursuant to the 1999 Glencoe loan agreement, the defendant accelerated the debt and terminated the rights of Freibert and Coe in their brokerage accounts. At the time of the default, Glencoe owed the defendant $775,433.69 under the 1999 loan. Merrill Lynch sent the funds from the brokerage accounts to the defendant to satisfy the debt.

In January 2004, the plaintiff filed his four-count complaint (later amended) in the district court. Count one sought a declaration that the plaintiff's 1999 pledge agreement was not a personal guaranty and was unenforceable due to misrepresentation or omission of relevant facts. The

defendant subsequently admitted the security agreement was not a personal guaranty, contending instead that it was a pledge of collateral. Count two alleged that the defendant breached its contract with the plaintiff and its implied covenant of good faith and fair dealing by allowing Coe to withdraw funds from his brokerage account without written approval. Count three alleged that the defendant assumed a fiduciary relationship with the plaintiff, which it breached by failing to provide him with information about the Glencoe loans and consenting to the withdrawal by Coe. Count four sought an accounting of the defendant's use of the proceeds from the plaintiff's securities account.

On February 23, 2004, the defendant filed a motion to dismiss the plaintiff's complaint for failure to state a claim upon which relief can be granted. The district court issued an opinion on October 25, 2004 dismissing counts one through three. On May 26, 2006, the court dismissed count four of the complaint.

The plaintiff filed a timely notice of appeal, but his brief discusses only whether a fiduciary duty existed between the parties and therefore only challenges the dismissal of count three of the complaint. The district court dismissed count three because the complaint did not allege a relationship between the parties founded on trust or confidence. Rather, the court found that the complaint alleged only "an ordinary contractual relationship." J.A. 66. The district court reasoned that since the plaintiff did not give any confidential information to the defendant and did not even deal directly with the defendant, negotiating instead through Coe, the complaint failed to allege a fiduciary relationship. The district court applied Illinois law, although it believed that the outcome would be the same whether Illinois or Kentucky law was applied. Neither party challenges the district court's choice of law ruling.

II.

Review of a district court's decision granting a defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is *de novo*. *Roberts v. Ward*, 468 F.3d 963, 967 (6th Cir. 2006). Like the district court, this court must determine, based on the allegations in the amended complaint, whether the plaintiff can prove any set of facts that would entitle him to relief. *Ibid*. The court must construe the amended complaint in the light most favorable to the plaintiff and accept all of its factual allegations as true. *Ibid*.

The parties agree that the relationship between Freibert and MLBFS was that of pledgor and pledgee. The plaintiff argues that relationship is one that is infused with fiduciary obligations on the part of the pledgee with respect to both the securities and Freibert himself. Fiduciaries owe a heightened duty to act in the interest of a beneficiary, characterized in an oft-quoted passage by Justice (then Judge) Benjamin Cardozo as "the duty of the finest loyalty." *Meinhard v. Salmon*, 249 N.Y. 458, 463-64, 164 N.E. 545, 546 (1928) (in the full passage, the court stated: "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A [fiduciary] is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."). The plaintiff seeks to impose this exacting standard against MLBFS, upon whom liability thereby rests, the plaintiff argues, for its failure to keep the plaintiff informed of the actions of his business partner and the resulting disproportionate personal loss due to the default on the loan made to their business venture.

We agree with the district court that Illinois law governs the decision in this case, although the applicable principles come from the jurisprudence generally in effect across most of the American jurisdictions. Thereunder, a fiduciary obligation can arise either from the inherent nature of a legal relationship – such as "between attorney-client, guardian-ward, trustee-beneficiary, and the like," *In re Estate of Glogovsek*, 248 Ill. App. 3d 784, 792, 618 N.E.2d 1231, 1238 (1993) – or from the conduct of the parties to a transaction. *Teachers Ins. & Annuity Ass'n of Am. v. LaSalle Nat'l Bank*, 295 Ill. App. 3d 61, 691 N.E.2d 881 (1998). "Where the alleged fiduciary relationship does not exist as a matter of law, the parties claiming that a fiduciary relationship exists must plead facts from which a fiduciary relationship arises." *Id.* at 71, 691 N.E.2d at 888. Those facts must include allegations that the purported beneficiary "placed trust and confidence in another who thereby obtained influence or superiority over that person." *Northern Trust Co. v. Burlew*, 171 Ill. App. 3d 1000, 1003, 525 N.E.2d 1123, 1126(1988). In this case, Freibert does not allege that he had any direct dealings with MLBFS; he cannot and does not rely on any conduct of the parties to establish a fiduciary relationship. Rather, he contends that the fiduciary relationship arises by operation of law through the inherent nature of the relationship between pledgor and pledgee.

In some ways, the holder of securities pledged as collateral may have an obligation in the nature of a fiduciary to preserve the collateral. For instance, a pledgee is required to act in good faith with respect to the collateral to ensure it is protected from loss or theft; if the collateral is sold, the pledgee must ensure that the pledgor receives notice and the pledgor's interest in the collateral is protected. *In re Housecraft Indus.*, 155 B.R. 79, 92 (Bankr. Vt. 1993); *Consolidated Jewelers, Inc. v. Std. Fin. Corp.*, 325 F.2d 31, 35 (6th Cir. 1963). It has also been said that "[a] pledgee owes a

fiduciary duty of care to preserve and protect the pledged property, and may be liable for conversion if the pledge is wrongfully sold or transferred without authority." *Hartford v. State Bar of Calif.*, 50 Cal.3d 1139, 1153 n.11, 791 P.2d 598, 607 n.11 (Cal. 1990). But we believe that the plaintiff makes too much of these very general propositions, which establish no more than the obligation to prevent loss, theft, or waste of the collateral.

Under Illinois law, the relationship between a creditor and a third party who pledges collateral for the debt is that of debtor and creditor. *Frankel v. Otiswear, Inc.*, 216 Ill. App. 3d 204, 576 N.E.2d 955 (1991). In *Frankel*, the plaintiff pledged a treasury note as collateral for a loan by First National Bank to Otiswear, Inc. About a year later, Steven Otis, the owner of the company, refinanced the loan through Skokie Federal Savings & Loan Association. Without the plaintiff's knowledge, Otis used the collateral that the plaintiff pledged to obtain a $150,000 line of credit from Skokie Federal. Otis used most of the loan proceeds to pay off the First National Bank loan, and First National sent the treasury note to Skokie Federal. After the note matured, Skokie Federal purchased a substitute treasury note from the proceeds. The plaintiff was unaware of these transactions. When Otis defaulted on the loan from Skokie Federal, the plaintiff filed a lawsuit that included a negligence claim against Skokie Federal. The trial court granted the defendant's motion to dismiss, and the plaintiff appealed to the Appellate Court of Illinois. The appellate court affirmed, finding that the bank owed no duty to the plaintiff:

> Plaintiff next alleges that the trial court erroneously dismissed count XII of her third amended complaint which was an action against defendant Skokie Federal for negligence. Plaintiff maintains that defendant, Skokie Federal, owed her a duty to inquire as to Steven Otis' authority to transfer the treasury note because she was a third party owner of property which was pledged to the bank as collateral for the debt

of another. Plaintiff fails to cite any Illinois case which rules that a bank has a duty to a third party owner of collateral which is pledged as an accommodation for the maker of a note. . . . The relationship between a bank and a third party who pledges collateral for a loan is "an ordinary debtor-creditor relationship." (*Northern Trust Co. v. Burlew* (1988), 171 Ill. App. 3d 1000, 1003, 121 Ill. Dec. 816, 525 N.E.2d 1123.) [sic] In order to establish the existence of a fiduciary relationship, a party must demonstrate that it placed confidence and trust in another who thereby obtained superiority or influence over said party. *Northern Trust Co.*, 171 Ill. App. 3d at 1003, 121 Ill. Dec. 816, 525 N.E.2d 1123; *Edward v. Miller* (1978), 61 Ill. App. 3d 1023, 1027, 19 Ill. Dec. 82, 378 N.E.2d 583. . . . [P]laintiff failed to allege facts which would demonstrate that defendant Skokie Federal had a duty to her. Absent this fundamental element, a negligence claim fails. (*See Swett v. Village of Algonquin* (1988), 169 Ill. App. 3d 78, 82, 119 Ill. Dec. 838, 523 N.E.2d 594.) [sic] In addition, plaintiff had no fiduciary or confidential relationship with defendant Skokie Federal.

*Frankel*, 576 N.E.2d 955, 963-64, 216 Ill. App. 204, 219 (1991). The court affirmed the dismissal of the claim.

We find the *Frankel* case persuasive authority on the question of the relationship between Freibert and MLBFS in this case. *Frankel* did not involve a co-pledgor, as here, but the court plainly stated that the investment of "trust and confidence" by the pledgor in the holder of the pledged property was a "fundamental element" of a claim for breach of a fiduciary duty because such a relationship does not arise in that context as a matter of law. We agree with that reasoning. A creditor who seeks security for a debt assumes no duty to tend to the welfare of a third party who furnishes that security. The relationship between creditor and pledgor may even be adversarial at times; certainly there is no stricter duty of loyalty that prevails over "the morals of the market place." *Meinhard*, 249 N.Y. at 464, 164 N.E. 545, 546.

Finally, we must observe that the pledge documents themselves negate any expectation Freibert might have entertained that MLBFS would in any way mediate the relative risk exposure

of Coe and Freibert.  Paragraph 9 of the pledge agreement specifically absolved MLBFS from any duty "to resort to any other collateral or security, pursue or exhaust any remedy against Grantor, Customer or any other party[,] or observe any formality of notice." J.A. 45.  Freibert's argument that when MLBFS allowed Coe to withdraw securities from his own account Freibert's securities were put a greater risk is answered by the language in paragraph 9.  Although MLBFS could not countenance acts of waste, theft, or fraud with respect to the collateral, it had no obligation to prefer one pledgor's assets over another's when it sought to satisfy the debt.

### III.

We agree with the district court's conclusion that the plaintiff could prove no set of facts in support of his contention that MLBFS breached a fiduciary duty owed to the plaintiff.  Accordingly, we **affirm** the judgment of the district court.